UNITED STATES *v.* LOUISIANA ET AL.

No. 9, Orig.   Argued October 9, 1967.—Decided December 4, 1967.

*Louis F. Claiborne* argued the cause for the United States. On the brief were *Solicitor General Marshall, Assistant Attorney General Weisl, Richard A. Posner* and *George S. Swarth.*

*Victor A. Sachse,* Special Assistant Attorney General of Louisiana, argued the cause for defendant State of Louisiana. With him on the brief were *Jack P. F. Gremillion,* Attorney General, *John L. Madden,* Assistant Attorney General, and *Paul M. Hebert, Thomas W. Leigh, W. Scott Wilkinson, J. B. Miller, Oliver P. Stockwell, J. J. Davidson* and *Frederick W. Ellis,* Special Assistant Attorneys General.

*Crawford C. Martin,* Attorney General of Texas, and *Houghton Brownlee, Jr.,* Assistant Attorney General,

argued the cause for defendant State of Texas. With them on the brief were *George Cowden,* First Assistant Attorney General, *J. Arthur Sandlin,* Assistant Attorney General, *A. J. Carrubi, Jr.,* and *Price Daniel.*

MR. JUSTICE BLACK delivered the opinion of the Court.

In *United States* v. *California* (the first *California* case), 332 U. S. 19 (1947), we held that the States did not own the submerged lands off their coastlines and that the United States had paramount rights in these lands. Some States violently objected to this decision claiming that they had historically owned at least out to a distance of three geographical miles from their coastlines; others asserted a historical claim out to three marine leagues from their coastlines. Responding to these objections, Congress in 1953 passed the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. §§ 1301–1315, which makes two entirely separate types of grants of submerged land to the States. The first is an *unconditional* grant allowing each coastal State to claim a seaward boundary out to a line three geographical miles distant from its "coast line." The second is a grant *conditioned* upon a State's prior history. It allows those States bordering on the Gulf of Mexico, which at the time of their entry into the Union had a seaward boundary beyond three miles, to claim this historical boundary "as it existed at the time such State became a member of the Union," but with the maximum limitation that no State may claim more than "three marine leagues" (approximately nine miles). In *United States* v. *Louisiana,* 363 U. S. 1 (1960), we held that Texas qualified for this conditional three-league grant. We did not decide, however, what is the "coast line" from which this three-league grant is measured. That question was specifi-

cally reserved.[1] Texas now claims that, for purposes of the three-league grant, its coastline extends to the seaward edge of artificial jetties constructed by it in the Gulf of Mexico and that it is entitled to lease certain submerged lands, portions of which lie more than three leagues from any part of the natural shoreline of Texas, but within three leagues of these jetties. The United States claims these portions for itself and invokes our original jurisdiction for a supplemental decree to that effect. The question we must decide is whether Congress intended that this grant, based as it is on the historical boundaries of the State, be measured from artificial jetties constructed many years after the State's entry into the Union. For reasons to be stated we reject Texas' contention and hold, as the Act clearly says, that its three-league claim must be measured to "such boundary as it existed at the time such State became a member of the Union."

Texas relies heavily on this Court's prior decision in the second *California* case, *United States* v. *California*, 381 U. S. 139 (1965). Our opinion there, however, dealt, not with the conditional statutory grant we have here, but with the other unconditional grant—the congressional creation of a new and standard three-mile seaward boundary for all coastal States. While some States in the past had claimed three-mile seaward boundaries—a claim explicitly rejected by this Court in the first *California* case, *supra*—Congress made it clear by the following wording in § 4 of the Submerged Lands Act that it was

---

[1] Louisiana was the only State to raise the question and our answer was as follows: "We decide now only that Louisiana is entitled to submerged-land rights to a distance no greater than three geographical miles from its coastlines, *wherever those lines may ultimately be shown to be.*" 363 U. S., at 79. (Emphasis added.)

establishing a new standard boundary for all coastal States: "Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line . . . ." 67 Stat. 31, 43 U. S. C. § 1312. The decision in the second *California* case, *supra,* held that Congress had left it up to this Court to define the "coast line" from which the standard three-mile grant was to be measured. The Court then borrowed the international definition of coastline in the Convention on the Territorial Sea and the Contiguous Zone, [1964] 15 U. S. T. (Pt. 2) 1607, T. I. A. S. No. 5639, used by the United States in its foreign relations with other countries, reasoning that "[t]his establishes a single coastline for both the administration of the Submerged Lands Act and the conduct of our future international relations . . . . Furthermore the comprehensiveness of the Convention provides answers to many of the lesser problems related to coastlines which, absent the Convention, would be most troublesome." *United States* v. *California,* 381 U. S. 139, 165 (1965).

Article 8 of this Convention makes the following provision for artificially constructed extensions into the sea: "For the purpose of delimiting the territorial sea, the outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast." [1964] 15 U. S. T. (Pt. 2) 1607, 1609. Thus, it is clear that in the case of the three-mile unconditional grant artificial jetties are a part of the coastline for measurement purposes, and if Texas were claiming under the standard three-mile grant, its argument regarding the jetties would be far more persuasive.

Texas has not claimed the standard three-mile grant, however, but has asserted ownership over three marine leagues or approximately nine miles of submerged land, and this Court has sustained that claim. *United States*

v. *Louisiana, supra.* This it was allowed to do under that part of the Act providing the special conditional historical grant. There is a critical distinction, however, between this historical grant and the unconditional three-mile grant. The three-mile grant involved in the second *California* case is not keyed to the State's boundary as of any particular date, but the three-league grant is keyed to a State's boundary as of the date it entered the Union. This is clear from the words of § 2 (a) of the Act which state that the historical grant extends "to the boundary line of each such State where in any case such boundary *as it existed at the time such State became a member of the Union* . . . extends seaward (or into the Gulf of Mexico) beyond three geographical miles . . . ." 67 Stat. 29, 43 U. S. C. § 1301. (Emphasis added.) This meaning is reinforced by the wording of § 4 which states that "[n]othing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws *prior to or at the time such State became a member of the Union* . . . ." 43 U. S. C. § 1312. (Emphasis added.) This historical grant of three marine leagues is, through § 2 (b) of the Act, made to apply only to those States bordering the Gulf of Mexico. 43 U. S. C. § 1301.

In effect what Congress has done is to take into consideration the special historical situations of a few Gulf States and provide that where they can prove ownership to submerged lands in excess of three miles at the time they entered the Union, these historical lands will be granted to them up to a limitation of three marine leagues. No new state boundary is being created, but a State which qualifies simply is being given the same area it had when it entered the Union. Unlike the three-mile grant where this Court held that Congress left

boundary definitions up to it, here Congress granted land the boundaries of which are determined by fixed historical facts. This is clear from the wording of the statute itself. In making the three-mile grant Congress speaks in terms of "three geographical miles *distant from its coast line."* 43 U. S. C. § 1312. (Emphasis added.) In the three-league grant, however, the term "coast line" is omitted and in its place the word "boundary" is used with the following express qualification: "as it existed at the time such State became a member of the Union . . . ." No definitions are required by this Court and there is no need to resort to international law; Texas has simply been given that amount of submerged land it owned when it entered the Union.

Thus, the State of Texas, which has been allowed by the United States to claim a larger portion of submerged lands because of its historical situation, is limited in its claim by fixed historical boundaries. It may not combine the best features of both grants in order to carve out the largest possible area for itself. If it wishes to take advantage of the present three-mile grant then it may use its present coastline as defined by Article 8 of the Convention on the Territorial Sea and the Contiguous Zone, *supra,* to include artificial jetties. But if Texas wishes to take under the more expansive historical grant, it must use boundaries as they existed in 1845 when Texas was admitted to the Union. At that time there were no artificial jetties in existence so obviously they are not considered.

It cannot be ignored that the application of the Convention to Texas here would allow Texas, unlike all other States except Florida,[2] to expand its own state bound-

---

[2] In *United States* v. *Florida,* 363 U. S. 121 (1960), we held that Florida also was entitled to the historical three-league grant. Since historical claims by the other Gulf States of Louisiana, Mississippi,

aries beyond the congressional limitation simply because of a rule governing the relationships between maritime nations of the world. This is a domestic dispute which must be governed by the congressional grant. There is no reason why an international treaty should be applied when it simply works to take away land from the United States in order to give to Texas more land than it ever claimed historically. We cannot believe that Congress intended such a result.

Thus, we hold today that the congressional grant to Texas of three marine leagues of submerged land is measured by the historical state boundaries "as they existed" in 1845 when Texas was admitted into the Union. The United States is entitled to a supplemental decree to this effect, and we grant 60 days to each of the parties in which to submit proposed supplemental decrees for our consideration.

THE CHIEF JUSTICE and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, concurring in the result.

The Submerged Lands Act in § 3 (a) grants to the States "ownership of the lands beneath navigable waters within the boundaries of the respective States . . . ." 67 Stat. 30, 43 U. S. C. § 1311. The critical term "boundaries" is given three alternative definitions in § 2 (b) of the Act:

    1. "boundaries . . . as they existed at the time such State became a member of the Union," or

    2. "boundaries . . . as heretofore approved by the Congress," or

---

and Alabama were rejected in *United States* v. *Louisiana,* 363 U. S. 1 (1960), Texas and Florida are the only two States which qualify for the expansive grant of three marine leagues instead of the grant of three miles.

3. "boundaries . . . as extended or confirmed pursuant to section 4," *i. e.,* "three geographical miles distant from [the State's] coast line . . . ." [1]

We deal here with the first of these three alternative definitions of "boundaries" in § 2 (b). In *United States* v. *Louisiana,* 363 U. S. 1, this Court upheld Texas' claim to a historic boundary based on the Republic of Texas Boundary Act of 1836, which was in effect at the time of the Annexation Resolution of 1845. That Act described Texas' boundary in the Gulf of Mexico as running "three leagues from land."

Texas now contends that the location of its historic boundary is to be determined by measuring out three leagues from harbor jetties constructed sometime after 1845. This seemingly anomalous result is required, Texas argues, by the second *California* case, *United States* v. *California,* 381 U. S. 139. I cannot agree. The second *California* case dealt with a single issue: the meaning of the term "coast line" for purposes of the third alternative definition of "boundaries" in § 2 (b).[2] But Texas does not claim a boundary under that definition, and the term "coast line" simply does not appear in the definition of "boundaries" under which Texas does assert its claim. The second *California* case is, therefore, basically irrelevant.

My Brother HARLAN reaches the result urged by Texas but for very different reasons. He construes the statu-

---

[1] A proviso to § 2 (b) establishes a maximum for any of the three boundary definitions: "[I]n no event shall the term 'boundaries' . . . be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico . . . ."

[2] Presumably the construction there adopted would also apply to the term "coast line" in the maximum proviso of § 2 (b), n. 1, *supra,* but the United States does not contend that Texas' claim exceeds the § 2 (b) maximum.

tory phrase "boundaries as they existed" as referring to the "three leagues from land" formula of the Texas Boundary Act, and then applies this 1845 formula to present Texas shore conditions. The Court, on the other hand, construes "boundaries as they existed" as referring, not to the 1845 formula, but to a particular line—the line resulting from the application of the 1845 formula to 1845 conditions.

The difference between majority and dissent thus turns on a narrow question: whether the word "boundaries" in the first alternative definition in § 2 (b) refers to an operative definition or to a line. I adopt the latter construction because I think the former plays havoc with the ordinary understanding of the word "boundaries" and because the legislative history does not persuade me that Congress meant to use that word in an unusual sense. It is, of course, true that boundaries may shift when a constant operative definition is applied to changing conditions. But the ordinary understanding of the word "boundaries" is the resultant line, not the operative definition. Finally, when the phrase "as they existed" is appended to the word "boundaries," it simply does not make semantic sense to interpret "boundaries" as a general definition rather than a particular line.

For these reasons, I concur in the conclusions of the Court in this case.

MR. JUSTICE HARLAN, dissenting.

At the outset, it is worth remarking that this case is but an epilogue to our decision in *United States* v. *Louisiana,* 363 U. S. 1, and arises out of the reservation of jurisdiction in this Court's decree in that proceeding. It is not a new case in its own right. Had the Court paused to remind itself of that fact it might have been less ready to cut loose from basic things that were decided there. For reasons stated in this opinion, I believe that

the decision upon the issue now in dispute should be in favor of the Texas position.

The question in this proceeding is whether artificial jetties, constituting permanent harbor works, are to be reckoned as part of the base line in calculating the three-league grant of submerged lands in the Gulf of Mexico to which we have already held Texas is entitled under the Submerged Lands Act. The opinions of the majority declare that they may not be, by a beguilingly simple process of reasoning that boils down to this syllogism: the outward limit of Texas' three-league grant is determined under the Act by the location of its maritime boundary "as it existed" in 1845, when it was admitted to the Union; these harbor works were not in existence at that time; therefore, these works play no part in fixing the location of the boundary. Our decision in *United States* v. *California,* 381 U. S. 139, wherein we held that similar harbor works were includable in calculating the outward limit of California's submerged lands grant, has no application, it is said, because California's grant was not dependent upon its "admission" boundary.

The major premise of the majority's reasoning is, I believe, demonstrably wrong. The assumption that the statutory term "as it existed" was intended to freeze Texas' seaward boundary (and hence the extent of the Act's grant) as of 1845 is fundamentally inconsistent with the basis on which we held in the initial stage of this case that Texas was entitled to a three-league grant at all. The Court's prior opinion upheld the claims of Texas only because Texas *now has* a valid state boundary "three leagues from land." [1] This present boundary is entirely independent of the Submerged Lands Act, which neither created it nor affected its location. The question before the Court at this time is not where that boundary was in 1845, but where it is now.

---

[1] See *infra,* at 171.

The words "as it existed" were fully and carefully interpreted in the Court's earlier opinion, and they were held to serve a purpose different from and irrelevant to the determination of the *location* of any state boundary. Contrary to the impression left by today's opinion, the language of the grant made in the Submerged Lands Act does not contain these words. The operative section of the Act simply grants to every coastal State "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters." [2] To take under this language, a State may either prove an existing boundary, subject to a limitation of three leagues in the Gulf of Mexico and of three miles in the Atlantic or Pacific Ocean, or establish a new boundary three miles from its coastline pursuant to a separate section of the Act. [3] The State must, however, presently have some boundary in order to take anything. The term "boundaries" is defined elsewhere in the Act to include boundaries "as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress." [4] The purpose of this section, we held, was simply to restrict claims to boundaries that had, at one time or another, been approved by Congress. [5]

On the basis of this understanding of the term "as it existed," we held in our prior opinion that the present maritime boundary of the State of Texas is defined by the Republic of Texas Boundary Act of 1836, [6] because that Act was approved by Congress pursuant to its 1845 Resolution of Annexation of Texas. [7] That

---

[2] 67 Stat. 30, 43 U. S. C. § 1311 (a).

[3] 67 Stat. 31, 43 U. S. C. § 1312.

[4] 67 Stat. 29, 43 U. S. C. § 1301 (b).

[5] 363 U. S., at 26–28.

[6] 1 Laws, Republic of Texas 133 (1836).

[7] 363 U. S., at 36–65.

Act claimed for Texas a boundary "three leagues from land." As the United States here concedes, maritime boundaries defined by reference to the shore are inherently mobile with changes in the configuration of the shoreline. Hence the present location of the boundary line drawn in 1836 is not necessarily the same as its location in 1836 or 1845. Below, after presenting in some detail the argument that the limit of the Submerged Lands Act grant is the *present* location of the historical boundary of the State of Texas, I shall consider the question whether these artificial jetties are to be included in determining that location.

## I.

The Court's opinion in *United States* v. *Louisiana, supra,* makes it abundantly clear that the question now before us is the present location of the Texas boundary that was acknowledged in 1845, and that the words "as it existed" were not intended to answer that question.

### A. THE USE OF PRESENT BOUNDARIES.

As the earlier opinion explained, the congressional assumption that some States have existing historic boundaries was based on the history of this Court's treatment of submerged lands.[8] The Court had early held that the States owned the land beneath their inland navigable waters. *Pollard's Lessee* v. *Hagan,* 3 How. 212. Following that case it was widely believed that the same rule would apply to the marginal sea, that is, that the States owned the land beneath the waters of the sea within their boundaries.[9] This belief was based on two assumptions neither of which was authoritatively tested until the 1940's: first, that at least some States had valid boundaries in the sea, and second, that the States owned sub-

[8] 363 U. S., at 16–18.
[9] See 363 U. S., at 16.

merged land within them. In a series of cases beginning in 1947, the *second* assumption was destroyed by this Court: the United States was held to have paramount rights in offshore lands as an attribute of national sovereignty.[10] The *first* assumption, however, was explicitly left standing by those decisions:

> ". . . The question here is not the power of a State to use the marginal sea or to regulate its use in absence of a conflicting federal policy . . . .
>
> . . . . .
>
> ". . . We intimate no opinion on the power of a State to extend, define, or establish its external territorial limits or on the consequences of any such extension *vis à vis* persons other than the United States . . . . *The matter of State boundaries has no bearing on the present problem.*" [11] (Emphasis added.)

As we held in the earlier phase of the present case, Congress' purpose in the Submerged Lands Act was to restore the situation to what it had assumed it to be prior to 1947, and its method of doing this was to "quitclaim" back to the States the "paramount rights" that this Court had found to be an attribute of national sovereignty.[12] This quitclaim, like the cases that led to

---

[10] *United States* v. *California*, 332 U. S. 19; *United States* v. *Louisiana*, 339 U. S. 699; *United States* v. *Texas*, 339 U. S. 707.

[11] The quotation is from the opinion of MR. JUSTICE DOUGLAS, for the Court, in *United States* v. *Louisiana*, 339 U. S. 699, at 704, 705 (1950). The quoted statement is then explicitly relied upon in the subsequent case involving Texas, *United States* v. *Texas*, 339 U. S. 707, at 720. In these cases, the two States had asserted that they had historic boundaries in the sea and were therefore not subject to the rule of the first *California* case that the United States had paramount rights in the marginal sea. This Court ruled against the state claims, holding that the existence and location of state boundaries were irrelevant.

[12] 363 U. S., at 17–20, 24–29.

it, had nothing to do with the validity or location of state maritime boundaries. As Senator Cordon, the Acting Chairman of the Committee on Interior and Insular Affairs and the bill's chief exponent in the Senate, put the matter,

> "The States of the United States *have* legal boundaries. It is not a part of the power or the duty of Congress to make determination with reference to those boundaries, or *where those boundaries should lie.* It is a matter for the courts to determine, or for the United States . . . and . . . the several States, to reach an agreement upon. The pending bill does not seek to invade either province. . . . Whenever a question arises as to a boundary, it will be determined exactly as any other question in law is determined, and the boundary will be established.
>
> ". . . It is not within the province of Congress to change the *present* boundaries of Texas without the consent of the State of Texas." 99 Cong. Rec. 2620. (Emphasis added.)

In the Court's prior opinion in this litigation we expressly adopted this construction of the Act. We accepted the *then* contention of the United States that the "Act did not purport to determine, fix, or change the boundary of any State, but left it to the courts to ascertain whether a particular State had a seaward boundary." [13] We went on to say,

> "[W]e find a clear understanding by Congress that the question of rights beyond three miles turned on the existence of an expressly defined state boundary beyond three miles. Congress was aware that several States claimed such a boundary. Texas throughout repeatedly asserted its claim that when an independent republic its statutes established a

---

[13] 363 U. S., at 11.

three-league maritime boundary, and that the United States ratified that boundary when Texas was admitted to the Union . . . .

"It was recognized [by Congress] that if the legal existence of such boundaries could be established, they would clearly entitle the respective States to submerged land rights to that distance under an application of the *Pollard* rule to the marginal sea. Hence . . . the right of the Gulf States to prove boundaries in excess of three miles was preserved." [14]

## B. THE WORDS "AS THEY EXISTED."

In the first phase of this case, the problem was which, if any, of the five Gulf States had boundaries that were cognizable for purposes of the Submerged Lands Act grant. Congress had limited boundaries so cognizable to boundaries "as they existed" at admission or "as heretofore approved" by Congress. The Court's decision at that time therefore turned entirely on the meaning of those two terms, which were consequently subjected to exacting analysis. We at that time rejected a contention made on behalf of the States, but apparently now adopted by the Court, that the words "as they existed" referred simply to the location of state boundaries at the time of admission; [15] we held, quite to the contrary,

---

[14] 363 U. S., at 24–25.

[15] The argument of the States was that the words "as they existed" included boundaries unilaterally declared prior to admission. 363 U. S., at 13, 15. The theory appears to have been that the words had merely a "locating" function. Finding that the purpose of these words was not clearly revealed by the Act on its face, 363 U. S., at 16, we turned to the legislative history and concluded that the words were instead meant to require congressional approval of the State's boundary claim at the time of admission or later. 363 U. S., at 16–30. Our view was that the Act granted land out to whatever present boundaries should prove to be valid, subject to the three-league limitation in the Gulf, but that only those that had been approved by Congress at or after admission could be considered valid for purposes of this grant.

that the purpose of these words was not to affect the location of present state boundaries but to single out those boundary claims that had at one time or another been approved by Congress as the only ones cognizable under the Act. We reasoned as follows:

"The earlier 'quitclaim' bills defined the grant in terms of *presently existing* boundaries, since such boundaries would have circumscribed the lands owned by the States under an application of *Pollard* to the marginal sea. . . . Some suggestions were made, however, that States might by their own action have effectively extended, or be able to extend, their boundaries subsequent to admission. To exclude the possibility that States might be able to establish present boundaries based on extravagant unilateral extensions, . . . subsequent drafts of the bill introduced the twofold test of the present Act— boundaries which existed at the time of admission and boundaries heretofore approved by Congress. *It is apparent that the purpose of the change was not to alter the basic theory of the grant, but to assure that the determination of boundaries would be made in accordance with that theory—that the States should be 'restored' to the ownership of submerged lands within their present boundaries, determined, however, by the historic action taken with respect to them jointly by Congress and the State.*" [16]   (Emphasis added.)

It was on this theory that we held that the words "as they existed" should properly be read to refer to the "moment of admission" rather than to preadmission claims, because Congress' purpose had been to allow only claims that it had approved.[17]

---

[16] 363 U. S., at 26–28.

[17] My Brother BLACK partially dissented from that opinion; it was his view that the words "as they existed" could not be read, as the

Having defined the term "as they existed" to mean "as acknowledged by Congress at the moment of admission," the Court in the prior litigation went on to hold that the Resolution of Annexation of 1845 [18] had, indirectly, been a congressional acknowledgment of the boundary established by the Republic of Texas Boundary Act of 1836, and that this Act therefore defines Texas' present boundary.[19] The Act reads, in relevant part, as follows:

> "beginning at the mouth of the Sabine river, and running west along the Gulf of Mexico *three leagues from land,* to the mouth of the Rio Grande . . . ." 1 Laws, Republic of Texas 133. (Emphasis in the Court's prior opinion.[20])

The problem before us here—where the boundary of Texas is—must be answered by determining where "three leagues from land" now is, for Texas has no historic boundary claim at all unless it is to "three leagues from land." The question is one that the Court does not even reach: should the words "from land" be taken, today, to refer to the shoreline in 1836, or 1845, or to the present shoreline, and, if to the last of these, should "land" include artificial accretions built upon the land? It is to that question that I now turn.

## II.

Texas' historic claim, by which the location of its present boundary must be determined, was to "three leagues from land." As the United States concedes, a boundary measured by the location of the edge of a

---

Court read them, to refer simply to a "legally accepted" boundary. 363 U. S., at 85, 89.

[18] 9 Stat. 108.

[19] 363 U. S., at 46–65.

[20] The passage is quoted at 363 U. S., at 36.

body of water is inherently ambulatory. In its brief here, the United States put the matter this way:

> ". . . Where a waterline is a boundary, the boundary follows the waterline through all its gradual, natural changes (*Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178, 189; *Banks* v. *Ogden*, 2 Wall. 57, 67; *Jones* v. *Johnston*, 18 How. 150; *New Orleans* v. *United States*, 10 Pet. 662, 717) . . . .
>
> ". . . The location of the boundary changes, but it is the same, not a new, boundary." [21]

At the very least, then, the present boundary of Texas must be measured from its present shoreline, which may have suffered accretion or erosion since 1836, and not from its 1845 shoreline.

The next question is whether the "land" whose present location is the base line from which to measure Texas' historic claim to "three leagues" includes artificial extensions of land such as the jetties that are at issue in this case. There can be no doubt, as the Court's opinion recognizes, that any maritime boundary established today would be taken to incorporate existing artificial structures of the kind built on the Texas coast and to be ambulatory with any such future artificial accretions. In *United States* v. *California*, 381 U. S. 139, 176, we specifically held that the three-mile boundary established by the Submerged Lands Act for States without historic boundaries would be measured from existing artificial structures and from future artificial structures as they might be built. We based our decision on the conclusion that Article 8 of the Convention on the Territorial Sea and the Contiguous Zone, quoted in the Court's opinion, *ante,* at 158, reflected a national

---

[21] Brief for the United States in Support of Motion for Injunctive Relief and Supplemental Decree as to the State of Texas 17, 16 (filed July 13, 1967).

and international view on this matter which should be taken to be incorporated within the three-mile-boundary section of the Submerged Lands Act.[22]

At the time of this *California* decision the argument was made that it would be undesirable to allow a State to extend its territory unilaterally by building onto the shoreline. We rejected that argument, finding a sufficient answer in the fact that the navigational servitude possessed by the United States gives it plenary power to forbid or regulate the construction of artificial extensions of the coastline.[23] Furthermore, under the principle of the Convention only "permanent harbour works" forming an "integral part of the harbour system" count as part of the shore for measuring purposes, so no trifling construction will have the effect of moving a boundary.

The parties here have stipulated that the jetties in question fall within the Convention's definition of "permanent harbour works." In other words, were these jetties on the coast of California, they would be treated as part of the "coast line" in determining the extent of California's statutory grant of submerged lands within three miles of its "coast line." The precise issue before us is whether the Convention principle should now be taken to be incorporated into the claim of "three leagues from land" in the Republic of Texas Boundary Act as it was incorporated into the term "coast line" used in the Submerged Lands Act.

The Court appears to conclude that a different result should be reached in the case of Texas because "[u]nlike

---

[22] We reached this result despite the fact that the Act preceded by five years the adoption of the international Convention, which consequently was not in any literal sense incorporated by the Act. We found, rather, that the Convention afforded the "best and most workable definition" of the statutory term "inland waters" and, derivatively, the statutory term "coast line." 381 U. S., at 161–165.

[23] 381 U. S., at 177.

the three-mile grant where this Court held that Congress left boundary definitions up to it, here Congress granted land the boundaries of which are determined by fixed historical facts." *Ante,* at 159–160. This statement in itself is correct, but the result does not follow. In the case of California, we were dealing with Congress' term "coast line" and we held that Congress had left us considerable latitude in interpreting it. In the case of Texas, to which Congress has granted land out to its "boundaries," the question left to this Court is narrower: we must determine whether the Texas Act defining those boundaries should be interpreted as of today to include artificial extensions of the shoreline in the base line for measuring those boundaries. That Congress referred us to an ancient boundary claim hardly justifies our assuming that that claim is self-explanatory.

Whether the words "three leagues from land," written in 1836, should now be held to mean "three leagues from the natural shore" or "three leagues from the coast line" as that phrase would be interpreted today is of course not an easy question. So far as we know, Texas had no artificial extensions of its coast in 1836 or 1845, and there is every reason to assume that it gave no thought to the present problem. Nor does it appear that any other sovereign in the 19th century had occasion to consider the question.

We are thus constrained, as one writer would have it, to guess what the Texas Legislature "would have intended on a point not present to its mind, if the point had been present." [24] Since Congress in effect left the interpretation of the Republic of Texas Boundary Act to us, that exercise involves no speculation as to how Congress interpreted or would have interpreted that Texas Act. The soundest principle of interpretation, it

---

[24] Gray, The Nature and Sources of the Law 173 (1963 ed.).

seems to me, is to assume that Texas would have come to the same conclusion that was reached by every nation that discussed the issue when it did arise. That conclusion, which was not only unanimous but also obvious and natural, was that maritime boundaries move as the shoreline on the sea is extended.

The question apparently first arose in the 1920's. The Preparatory Committee for the League of Nations Conference for the Codification of International Law, to be held at The Hague in 1930, submitted to the various nations the question "how the base line for measuring the breadth of territorial waters is to be fixed in front of ports." [25]   Great Britain and several other nations responded, "In front of ports, the base line from which the territorial waters are measured passes across the entrance from the outermost point or harbour work on one side to the outermost point or harbour work on the other side." [26]   The United States quickly adopted the British suggestion.[27]   Several nations, although not, like Great Britain, expressing the principle in the present tense as an existing rule, said that much the same principle "should be" the rule.[28]   All together, of 18 responses received by the Preparatory Committee, none favored a different base line.[29]   The Committee then formulated the principle that "territorial waters are measured from

[25] League of Nations Doc. No. C.74.M.39.1929.V, League of Nations Conference for the Codification of International Law: Bases of Discussion: Vol. II—Territorial Waters, p. 45 [hereinafter cited as "Bases of Discussion"].

[26] *Id.*, at 46.

[27] See League of Nations Doc. No. C.351 (b).M.145 (b).1930.V, Acts of the Conference for the Codification of International Law: Meetings of the Committees; Vol. III—Minutes of the Second Committee: Territorial Waters, p. 200 [hereinafter cited as "Acts of Conference"].

[28] Bases of Discussion 46.

[29] *Id.*, at 45–47.

a line drawn between the outermost permanent harbour works," and commented that "agreement exists" on this principle.[30]

Because of disagreement over unrelated matters, the Hague Conference produced no treaty on territorial waters.[31] The matter was raised again, however, beginning in 1952, and the International Law Commission drafted the document that became, in 1958, Article 8 of the Convention on the Territorial Sea and the Contiguous Zone, *ante,* at 158. The ILC's comment was "This article is consistent with the positive law now in force."[32] The ILC draft was presented to the UN Conference on the Law of the Sea, where M. Francois, the Expert to the Secretariat of the Conference, commented that "States had long regarded harbour works such as jetties as part of their land territory and that practice should be universally recognized as unchallengeable."[33] The principle was adopted by the Conference, after discussion and without dissent, and became Article 8.

The United States here contends that because the outermost harbor-works principle had not been articulated in 1836 or 1845, it should not now be a basis for interpreting the Republic of Texas Boundary Act. The premise of this contention is sound: an ancient statute should ordinarily be interpreted in light of the doctrines prevailing at the time it was passed, rather than of subsequent changes in governing principles. But the conclusion drawn from this premise by no means follows in this instance. The outermost permanent harbor-works principle was not a new rule substituted for an older,

---

[30] *Id.,* at 47.

[31] See Acts of Conference 211.

[32] 1954 I. L. C. Yearbook 155.

[33] U. N. Doc. No. A/Conf. 13/39, United Nations Conference on the Law of the Sea, Official Records, Volume III: First Committee (Territorial Sea and Contiguous Zone) 142.

conflicting one. It was simply the first answer to a problem that had not arisen before. The unanimity of nations in 1930 strongly suggests that Texas, had it considered the problem in 1836, would have reached the same conclusion.

The conclusion that the Texas Boundary Act should be read today in light of the outermost harbor-works principle is fortified by the fact that the result to which this reading leads is eminently sensible. Considerations of history aside, there is no good reason (and certainly there is no suggestion in the Submerged Lands Act or its legislative history) why the principles governing measurement of the present-day boundary of the State of Texas should be different from those that govern both the measurement of the boundary of California and the measurement of the boundary of the United States in the Gulf of Mexico opposite Texas. Furthermore, the various practical considerations that led the nations of the world to agree unanimously on the principle of Article 8 should surely have considerable force here. The Court's rule, maintaining the boundary of Texas immobile at its 1845 location, seems highly unworkable even if it now proves possible to determine that location at all; [34] for the result of such a rule is that at some future time not only artificial but natural extensions of the land mass might prove to be outside of "Texas." The alternative, suggested by the United States here but rejected by the United States for international purposes, would be to make the boundary mobile with re-

---

[34] No geodetic survey indicating the 1845 location of Texas' shoreline exists. At oral argument, both sides were at a loss to suggest any means by which the 1845 location of the boundary could be ascertained, except by agreement between the United States and Texas. This problem is, of course, typical of the difficulties that dictate the principle that maritime boundaries are inherently mobile.

spect to natural, but immobile with respect to artificial, changes. Such a rule involves obvious difficulties: the construction of harbor works may affect the configuration of the entire shoreline, making it soon impossible to determine where the "natural" change ends and the "artificial" change begins. The outermost permanent harbor-works principle, then, seems almost inevitable.

Believing that the limit of Texas' submerged land grant is its present boundary, that that boundary is defined by the Republic of Texas Boundary Act of 1836, and that that Act defines a boundary that should now be measured from the outermost points of the jetties in question, I respectfully dissent from the Court's determination of the issue before us.