**TEXACO, INC., Plaintiff,**

v.

**Stewart L. UDALL, Secretary of the Interior, Defendant.**

**Civ. A. No. 446–68.**

United States District Court

District of Columbia.

Feb. 7, 1969.

John J. Wilson, Whiteford, Hart, Carmody & Wilson, Washington, D. C., Paul F. Schlicher, New York City, Richard S. Lake, New Orleans, La., Stanley D. Robinson, Allen Kezsbom, New York City, for plaintiff.

Edmund B. Clark, Clyde O. Martz, John G. Gill, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant.

OPINION

SIRICA, District Judge.

This case concerns the boundaries of an oil and gas lease off the coast of Louisiana. It is one phase in the development of a body of law to regulate the exploitation of our undersea resources.

In 1936, Texaco, Inc. initially leased certain beds and bottoms of water bodies off-shore from Louisiana for gas and oil

development.[1] The lease covered submerged land in the Gulf of Mexico and included among other areas the Southwest Marsh Island Prospect which is the subject of this litigation. The general agreement with Louisiana was modified in 1943, but plaintiff-petitioner retained the above-mentioned prospect.

In both the 1936 lease and the 1943 modification agreement, the southern or seaward boundary of plaintiff's leasehold was described not in terms of miles or leagues, but rather as the limit of the territorial sovereignty of Louisiana. The 1943 agreement described the Marsh Island Prospect as follows:

BEGINNING at a point in the South Shore line of Marsh Island * * *; THENCE South into the marginal or maritime belt of the Gulf of Mexico to the extreme limit or boundary of the domain, territory and sovereignty of the State of Louisiana; THENCE Westerly along said limit or boundary to a point * * * THENCE North through the Gulf of Mexico to the South shore of Vermilion Parish and the North Boundary of State Mineral Lease No. 340;

THENCE Easterly following on and along the South Shore of Vermilion Parish * * * to the place of beginning.[2]

Thereafter the United States Supreme Court held that the states had no rights in or power over the area "lying seaward of the ordinary low water mark on the coast" and "outside of the inland waters of the states."[3] These decisions rendered unenforceable all state issued leases, including plaintiff's Louisiana State Lease No. 340, to the extent that they encompassed territory held by the Court to be federal property.

In response to these decisions and in an effort to foster the development of

America's offshore oil reserves, Congress, in 1953, enacted the Submerged Lands Act, 43 U.S.C. § 1301 et seq. (hereinafter cited as: SLA), and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. (hereinafter cited as: OCSLA). Under the SLA the United States released to the coastal states all of its right, title and interest to the lands beneath navigable waters for a distance of three miles from the coast line of the state or for such further distance as the state could establish as its boundary at the time it was admitted to the Union. In no event, however, could a boundary be interpreted as extending from the coast line more than three marine leagues [9 land miles] into the Gulf of Mexico. "Coast line" was defined in Section 2(c) of the SLA as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters * * *."[4]

In order to provide for a complete development of accessible offshore oil, the provisions of the SLA were supplemented by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. That Act provided that the submerged lands of the Outer Continental Shelf lying seaward of and outside of the area ceded to the state under the SLA were subject to the jurisdiction, control and power of disposition of the federal government, and the Secretary of the Interior was designated to administer all leasing and operations under the Act. Section 6 of the OCSLA provided that leases previously issued by the states would be validated and continued as federal leases insofar as they purported to cover submerged lands of the Outer Continental Shelf. Application to the Secretary of the Interior and the satisfaction of several criteria were statutory prerequisites to validation.[5]

1. State of Louisiana Mineral Lease No. 340.

2. Id. at Art. XI p. 23.

3. United States v. California, 332 U.S. 19, 34, 67 S.Ct. 1658, 91 L.Ed. 1889

(1947); United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950).

4. 43 U.S.C. § 1301(c).

5. 43 U.S.C. §§ 1334, 1335.

Texaco applied to the Secretary of the Interior for validation of the Louisiana Lease No. 340 pursuant to Section 6 of the OCSLA. While these validation proceedings were pending, the United States moved in the Supreme Court on December 20, 1955, for an order permitting it to file suit against Louisiana within the Court's original jurisdiction for the purpose of determining the number of miles to which Louisiana was entitled under the SLA and the location of the State's coast line for the purposes of that statute. On March 26, 1956, the government's motion was granted.[6]

Thereafter on March 12, 1958, plaintiff's Louisiana State Lease No. 340 was validated as Federal Lease OCS 0310 in a decision by the Secretary of the Interior acting through the Director of Land Management (this decision is hereinafter termed the Validation Lease). The Southwest Marsh Island Prospect, among other areas, was encompassed within Federal Lease OCS 0310. The southern or seaward boundary of the lease was designated as three leagues (9 mi.) from the "coast line" of Louisiana. The validation decision expressly recited that the term coast line was being used in Federal Lease OCS 0310 as "defined in Section 2(c) of the Submerged Lands Act."[7] The Validation Lease was the last of a series of administrative decisions dealing with the validity of the state lease.[8] At that time the location of Louisiana's coast line had not yet been determined by the Supreme Court for the purposes of the SLA and the OCSLA.

In 1960, the Supreme Court set Louisiana's state boundary at 3 miles while leaving the designation of coast line open.[9] On December 13, 1965, the Supreme Court entered Supplemental Decree No. 1 in United States v. Louisiana,[10] which decision while leaving unresolved the ultimate location of the coast line of Louisiana within the meaning of the SLA, decided that in the Marsh Island Area, the base line for determining the state's coast line was further seaward[11] than the government's shoreline proposal (Chapman Line).[12]

Such is the legislative and judicial background of the litigation presently before the Court. Texaco thereafter decided to commence drilling what has since been designated as well No. 44 in the Gulf of Mexico. It is at a location more than three leagues from the shoreline as defined in the Secretary's brief before the Supreme Court in United States v. Louisiana,[13] but within three leagues of the coast line as defined by

6. United States v. Louisiana, 350 U.S. 990, 100 L.Ed. 856, 76 S.Ct. 541 (1956).

7. Validation Lease at p. 1.

8. The initial decisions in the matter dated May 15, August 1, and August 2, 1956, were by the Director or the Acting Director of the Bureau of Land Management. The Solicitor of the Department of Interior, pursuant to authority delegated to him by the Secretary in a decision dated February 12, 1958, determined that the state lease included lands out to the three league mark from the coast line. See The Texas Co., 65 I.D. 75 (1958).

9. 363 U.S. 1, 79, 80 S.Ct. 961, 4 L.Ed.2d 1025, 1096 (1960); 364 U.S. 502, 81 S.Ct. 258, 5 L.Ed.2d 247 (1960).

10. 382 U.S. 288, 86 S.Ct. 419, 15 L.Ed.2d 331 (1965).

11. The boundary was said to include base lines consisting of (1) segments of, or salient points on, the line of mean low water on the mainland, on naturally formed islands, or on naturally formed low-tide elevations situated wholly or partly within three geographical miles from the low water line on the mainland or on such islands, and (2) straight lines across designated openings in the low water line. United States v. Louisiana, 382 U.S. 288, 289–290, 86 S.Ct. 419 (1965).

12. The Chapman Line is a line adopted in 1950 by certain federal officials to mark the coast line. It was used as the base line from which to measure the seaward extent of several of the zones set up by the United States and Louisiana in an Interior agreement dated October 12, 1956, for the purpose of administering the disputed area of continental shelf involved in United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961 (1960), 364 U.S. 502, 81 S.Ct. 258 (1960).

13. See Brief for the United States in Support of Motion for Judgment in United States v. Louisiana (1960), 363 U.S. 1 pp. 10–12, 32–81, 80 S.Ct. 961.

the Supreme Court's supplemental decision.

Texaco filed for approval with the Department pursuant to 30 CFR § 250.91 (a). Plaintiff's application was successively denied through several administrative steps. Each of the decisions grounded its denial in a construction of the lease validation which set the seaward boundary at three leagues from the Chapman shoreline, rather than three leagues from the coast line as defined in United States v. Louisiana.[14]

This Court has jurisdiction over the dispute pursuant to § 10 of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., which provides for judicial review of administrative actions.

■ The scope of the Court's review of the Secretary's decision is limited to determining whether the decision of the Secretary of the Interior construing the Department's 1958 order validating the Louisiana No. 340 Lease of Texaco, has a reasonable basis. See, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Duesing v. Udall, 121 U.S.App.D.C. 370, 350 F.2d 748, 752 (1965), cert. denied, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1965).

The defendant in this action has placed great emphasis on the decision of the Solicitor, 65 I.D. 75 (1958) which preceded the March 12, 1958 decision of the Director of the Bureau of Land Management. The Department contends that the two decisions must be read together and when so considered *in pari materia* create the rationality underlying the Secretary's construction of the validation agreement.

The Court must therefore weigh the various documents and determine whether together they afford a rational basis for the Secretary's decision.

The weight attributable to the Solicitor's opinion is substantially affected by two factors: (1) The chronological relationship of this document to subsequent statements by the same administrator; (2) the relative equivocity of each document insofar as it reflects or fails to reflect a position on the question. Both factors in this case lessen the weight which can reasonably be ascribed to the Solicitor's opinion.

The Solicitor's opinion was issued February 12, 1958. It was implemented by the Validation Lease OCS 0310 by the Bureau of Land Management one month later. The Validation Lease clearly defined "coast line" in terms of the evolving definition as employed in the SLA.[15] The Solicitor concurred in and signed the subsequent Validation Lease. This concurrence should be persuasive in any analysis of the Solicitor's view of the matter. The Validation Lease specifically alluded to the Solicitor's opinion; offered an explanation of his decision; was unequivocal; and he signed it. This document given its natural weight and significance would seem to be conclusive in this matter. But the Court must also consider the Solicitor's document for it is on that decision which the Secretary relies for the rational basis for his decision.

The Solicitor's opinion of February 12, 1958, offers little support to the Secretary's interpretation. The Solicitor was obviously and expressly aware of the

---

14. 382 U.S. 288, 86 S.Ct. 419 (1965).

15. See text accompanying note 4, *supra.* Although the statutory definition provides that the "coast line" is the "line of ordinary low water," it does not specify the points at which the coast of any state "is in direct contact with the open sea." Nor does it specify where it is that the "inland waters" end and the "open sea" begins. Accordingly, disputes over the location of the statutory "coast line" arose where coasts were irregular, where

extended indentations in the coast arguably could be said to constitute inland bays, or where the islands or other elevations (*e. g.*, reefs) existed a short distance from the mainland. See United States v. Louisiana, 389 U.S. 155, 88 S. Ct. 367, 19 L.Ed.2d 383 (1967) (Texas); United States v. California, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965); United States v. Louisiana, 364 U.S. 502, 503, 81 S.Ct. 258 (1960) (Louisiana, Mississippi, Alabama, Texas and Florida).

government's contention that the Chapman Line should be the northern coast line boundary in the Validation Leases:

Alternative locations for this line vary from the so-called Chapman line, which in the area covered by the Marsh Island Prospects, approximates their northern boundary, to the line set by the Louisiana Legislature * * * which adopts a line 10–15 miles farther seaward as the coastline of the State and places the State boundary 3 marine leagues south of that line. 65 I.D. at 80.

Nowhere, however, in his lengthy decision does he expressly designate the Chapman Line as the determinative factor in the lease boundary. Two statements of the Solicitor give some indication of what he was trying to achieve with his opinion.

Reading the two acts of Congress in context, and as an earnest attempt on the part of Congress to effect an equitable and harmonious disposition of leasing problems arising from the Tideland decisions of the Supreme Court by executing its constitutional powers in such a way as to avoid injustices to States or persons acting pursuant to their permission * * * it seems clear that the objectives can best be obtained by holding that any validation in this instance shall be strictly limited to those lands covered by the leases lying beyond the three mile limit but extending in no instance beyond 3 marine leagues from the line of ordinary low water as stipulated by law.

\*   \*   \*   \*   \*   \*

Under applicable law, that outer boundary is either 3 miles from the shoreline or it is 3 marine leagues from the shoreline. The secondary question is—Where is the shoreline?

The better authority is that the shoreline is a combination of the low watermark on the shore and straight lines from outer points on bays. *This*

*is consonant with the Submerged Lands Act.* 65 I.D. at 86, 90 (emphasis added).

The Solicitor manifested a clear intent to render his opinion in conformity with the SLA. The question remains whether he chose to prematurely decide the contested interpretation of the term "coast line" as it appears in that statute.[16] The most obvious answer to the question is that he never specifically did so in his opinion. Not that the opportunity did not arise. At one point in his discussion the Solicitor specifically adopted the position of the Attorney General in pending litigation as binding.

Basically, that position may be stated for the purposes of this decision as follows:

1. If the State of Louisiana received any maritime belt by implication at the time of admission, it was the 3-mile belt recognized by the United States as the maximum permitted by international law, but in any event the submerged lands and resources of the Gulf were not attributes of State sovereignty and did not pass to the State of Louisiana. * * *

2. The submerged lands granted to the State of Louisiana, as defined in section 2(b) of the Submerged Lands Act, are those lying within the boundary as it existed when the State entered the Union, or as since approved by Congress, not extending, however, more than 3 marine leagues into the Gulf of Mexico. * * * The Attorney General argues, of course, that there can be no justification for construing the boundary described in Louisiana's Enabling Act as including three leagues of water and submerged lands. That is the basic legal question before the Supreme Court for decision, and it is in that precise area that Congress made validation available, in order to serve equity, pending final determination of Louisiana's outer boundary. * * * 65 I.D. at 85–86.

---

16. See text accompanying note 4, *supra.*

He did not adopt, as he easily could have if he had so intended, the position of the Department and the Attorney General with respect to the Chapman Line as the northern boundary of the lease. It is this Court's interpretation of the Solicitor's opinion that he did not intend to utilize the Chapman Line, but rather that he chose to abide by the statutory definition and its subsequent judicial construction. *See* 65 I.D. at 90.

██ This interpretation renders the Solicitor's opinion complimentary to the Validation Lease in which he subsequently concurred. The Court in determining whether there is a rational basis for the Secretary's construction of the Validation Lease, will not interpret two related documents either drawn by or ascribed to by the same person within a thirty day period inconsistently when it is possible to read them consistently. To do otherwise, in the absence of an independent intervening reason, would be arbitrary and unreasonable.

The Secretary also proposes several technical arguments based on the language of the opinion from which he imputes an intent to use the Chapman Line as the boundary. In light of his specific concurrence in the unequivocal language in the Validation Lease, I cannot agree that such arguments establish a foundation for a reasonable basis for his action. The Court is not holding that in the absence of the Validation Lease the Secretary would not be acting reasonably in construing the boundary to be the Chapman Line. Such a consideration is not germane to the problem since, as the government agrees, all the relevant data must be considered.

██ Therefore, for the foregoing reasons this Court finds that the Secretary was without a reasonable basis for his decision that the Validation Lease did not encompass the proposed drilling site.

Also, defendant's refusal to issue plaintiff a permit to drill well No. 44 was arbitrary and capricious and otherwise not in accordance with law. Plain-

tiff's motion for a summary judgment is granted—defendant's denied. Counsel for plaintiff will submit an appropriate order.