## UNITED STATES v. LOUISIANA ET AL.
## (TEXAS BOUNDARY CASE).

No. 9, Orig. Argued November 18, 1968.—Decided March 3, 1969.

*Louis F. Claiborne* argued for the United States on its proposed supplemental decree as to the State of Texas. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Martz, Roger P. Marquis,* and *George S. Swarth.*

*Houghton Brownlee, Jr.,* Assistant Attorney General of Texas, argued for the State of Texas on supplemental decree proposed by Texas. With him on the brief were

1

*Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *A. J. Carubbi, Jr.,* Executive Assistant Attorney General, and *J. Arthur Sandlin* and *C. Daniel Jones, Jr.,* Assistant Attorneys General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This proceeding is a sequel to last Term's *United States* v. *Louisiana,* 389 U. S. 155 (1967), in which we held that the three-league (nine-mile) belt of submerged lands beneath the Gulf of Mexico granted to Texas by the Submerged Lands Act of 1953[1] was not to be measured from the edge of artificial jetties built in the Gulf by Texas since 1845 but from Texas' coastline as it existed in 1845 when Texas was admitted to the Union. The cartographic work required to define the 1845 coastline and the gulfward boundary three leagues distant has been completed, and the United States and Texas have agreed upon their locations.[2] However, the 1845

---

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315. In *United States* v. *Louisiana,* 363 U. S. 1, 84 (1960), we held that the Act entitled Texas, as against the United States, to the submerged lands underlying the Gulf of Mexico to a distance of three marine leagues from Texas' "coast line." We expressly reserved the question of what is the "coast line" from which to measure this three-league grant. 363 U. S., at 79. See also 389 U. S., at 156–157 and n. 1.

[2] A Stipulation filed with the Court identifies Texas' 1845/1849 coastline and also its gulfward boundary three leagues distant. An Act of November 24, 1849, Laws, 3d Tex. Leg., c. 2, p. 4, adopted with the consent of Congress, Act of July 5, 1848, 9 Stat. 245, extended Texas' boundary opposite Sabine Pass. The United States has accepted Texas' three-league boundary opposite the western half of Sabine Pass, not as a boundary as it existed when the State came into the Union in 1845, but as one approved by Congress before passage of the Submerged Lands Act, and as such equally entitled to recognition under § 2 (b). The line identified in the Stipulation as the line to be recognized as Texas' historic offshore boundary includes the 1849 extension, but the United States reserves

coastline has been substantially modified by extensive erosion and some accretion in the intervening period of more than a century. This modification has occasioned a dispute between the United States and Texas as to whether the Act's express limitation in § 2 (b), that in no event shall the boundaries of the grant of submerged lands "be interpreted as extending from the coast line . . . more than three marine leagues into the Gulf of Mexico," is to be read as measuring from the 1845 coastline, as Texas contends, or from the coastline as it exists currently or at any time in the future, as the United States contends.[3] If the limitation is read as measuring from

the effectiveness of that extension as against other claims, for example, any that might be asserted by Louisiana. See Memorandum of United States 16–18.

[3] Section 2, 43 U. S. C. §1301, so far as relevant here, is as follows:

"(a) The term 'lands beneath navigable waters' means—

.        .        .        .        .

"(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles,

.        .        .        .        .

"(b) The term 'boundaries' includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 4 hereof but in no event shall the term 'boundaries' or the term 'lands beneath navigable waters' be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico;

"(c) The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters."

4

the modern, ambulatory coastline, Texas claims that it would be denied substantial submerged acreage as a result of post-1845 erosion.[4] We ordered oral argument. 393 U. S. 811 (1968). We agree with the United States that the term "coast line" means the modern, ambulatory coastline.

The term "coast line" also appears in § 4 of the Submerged Lands Act. Section 4 approves a seaward boundary three miles distant from the "coast line" of each coastal State, except that if a State can show that its boundary as it existed at the time of entry into the Union or as approved by Congress extended into the Gulf of Mexico more than three miles from the coastline, that State is entitled to claim the submerged lands within such boundary, subject however to the express limitation of § 2 (b). See §§ 2 and 4, 67 Stat. 29, 31, 43 U. S. C. §§ 1301, 1312; *United States* v. *Louisiana*, 363 U. S. 1 (1960).

The argument of the United States that "coast line" means the modern ambulatory coastline is based on our decision in *United States* v. *California*, 381 U. S. 139 (1965). The issue there was whether particular bodies of water on the California coast were "inland waters" within the meaning of § 2 (c) which provides that "[t]he term 'coast line' means the line . . . marking the seaward limit of inland waters." We held that the legislative history showed that Congress intended that the courts should define the term "inland waters." In discharging that assignment we concluded that the Convention on the Territorial Sea and the Contiguous Zone[5] provided "the best and most workable definitions available." Accordingly, we adopted those definitions for purposes of the Submerged Lands Act. 381 U. S., at 165.

---

[4] It was represented on oral argument that between 17,000 and 35,000 acres would be lost to Texas as a result of such erosion.

[5] [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639.

The Convention defines "coast line" as the modern, ambulatory coastline; the decree entered several months later in accordance with our opinion in *California* expressly provides that "[t]he coast line is to be taken as heretofore or hereafter modified by natural or artificial means . . . ." 382 U. S. 448, 449 (1966).

We said further in *California* that "[t]his [adoption of the Convention's definitions] establishes a single coastline for . . . the administration of the Submerged Lands Act . . . ." 381 U. S., at 165. Our conclusion in this case that "coast line" means the modern, ambulatory coastline therefore necessarily follows from our decision in *California.* See *United States* v. *Louisiana, supra,* 389 U. S., at 162, n. 2 (STEWART, J., concurring in result). There is no basis for a finding that "coast line" has a different meaning for the purpose of determining the baseline for measurement of the three-league maximum limitation. Nothing on the face of the Act or in its legislative history supports a different meaning.[6] Rather it seems evident that Congress meant that the same "coast line" should be the baseline of both the three-mile grant and the three-league limitation. Texas suggests no ground for a distinction, but argues that measurement from the modern, ambulatory coastline would produce an inequitable result and work havoc with orderly mineral development. It is true that last Term's decision that the three-league belt should be measured from the 1845 coastline and not from the edge of subsequently constructed artificial jetties deprived Texas of the benefit of post-1845 accretion. It is also true that the use of the modern, ambulatory coastline as the baseline from which the limitation is measured will penalize Texas for post-1845 erosion and may present practical difficulties for

---

[6] Our decision in *California* also forecloses any argument that the term "coast line" means the coastline as it existed at the date of passage of the Submerged Lands Act.

mineral lessees. But any alleged inequitable results, as well as any alleged detriment to orderly mineral development, derive from a consistent reading of the scheme Congress fashioned; thus Texas must look to Congress for relief.

Since the parties have agreed that the decree proposed by the United States should be entered if its view on the disputed point is sustained, we direct the entry of the supplemental decree proposed by the United States.[7]

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

[For supplemental decree entered in this case, see *post,* p. 836.]

MR. JUSTICE BLACK, dissenting.

I would decide this case in favor of Texas. It is another of a long-continued and apparently never-ending series of lawsuits between the United States and Texas, trying to settle the location of the boundaries of lands submerged under ocean and Gulf waters that Congress, in 1953, validly conveyed to the States in the Submerged Lands Act.[1] The dispute is a narrow one. This Court held in *United States* v. *Louisiana,* 363 U. S. 1 (1960), that the United States had in the Submerged Lands Act conveyed to Texas submerged lands out into the Gulf

---

[7] Although the three-mile minimum grant measured from the modern coastline has no present application in the case of Texas, the decree includes provisions to cover the situation which would exist if accretion or artificial construction should at some future time extend the coastline more than six miles beyond the 1845–1849 position.

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315.

for a distance of three leagues, about nine miles, from the State's coastline.  And we held in *United States* v. *Louisiana* (Texas boundaries), 389 U. S. 155, 161 (1967), that "the congressional grant to Texas of three marine leagues of submerged land is measured by the historical state boundaries 'as they existed' in 1845 when Texas was admitted into the Union."  That case, however, did not attempt to identify with precision where the coastline was located, but that question is no longer in dispute for here the parties have stipulated the location of the seaward boundary of Texas when it was admitted into the Union.  In that same case we rejected arguments that we should follow the second *California* case, *United States* v. *California,* 381 U. S. 139 (1965), in holding that a dispute over the state and national submerged boundary line should be decided by international law and treaties.  In declining to apply the same treaty in the United States and Texas dispute, we said, "This is a domestic dispute which must be governed by the congressional grant," 389 U. S., at 161, and thereby rejected the idea that the question was controlled by international law or treaty.  Obviously, the same principle equally applies here, in this further phase of the very same submerged land dispute.  No one of the international family of nations is greatly interested and certainly none can control the way in which another nation divides itself into subordinate governmental units for control of that country's own inland waters.  That is a problem for each nation to decide for itself.

Moreover, I pointed out in my dissent to the Court's holding on the counter motions in the *Louisiana Boundary Case,* decided today, reasons why the second *California* case should not be held to establish a uniform rule for deciding all controversies concerning disputed questions of submerged land boundaries arising out of the Submerged Lands Act. *Post,* p. 78.  This case

now before us concerning the Texas boundary again refutes any idea that applying treaties and international law to settle such local disputes between the Federal Government and a State will bring about stability, certainty, or expedition in carrying out the will of Congress. For here we are told that even if the United States wins, it will probably take a very long time to decide this controversy under the complexities of measurement necessary in accordance with the international treaty rules.[2] We are warned also that another boundary lawsuit between State and Nation is already brewing with a second just around the corner from it. Consolation is also offered because we are told that we can continue in case after case to keep our decrees open for future lawsuits. All of this goes to emphasize to me that it has been a mistake for this Court to advance the view that these land boundaries should be settled by courts. Obviously, the best way to settle a boundary dispute, whether water or land, is to designate a governmental agency that can undertake the complex problem of determining and marking where the inland and territorial waters meet. As I have pointed out in my dissent in the *Louisiana Boundary*

---

[2] The United States describes the way in which the measurements will have to be taken as follows:

"This work is done by photogrammetry—that is, by aerial photographs taken when the sea is exactly at the level of mean low tide. These are then correlated with maps by use of control points, and the water line shown on the photographs is transferred to the maps. There are only limited times when the tide reaches the proper stage while there is suitable daylight for such photography and there is no offshore or onshore wind to dislocate the water line. When the necessary conditions do concur, the tide stage lasts only a few minutes. Thus, photography of an extensive coast such as that of Texas may be a protracted operation. Subsequent cartography requires skilled and painstaking work that cannot be done hurriedly or by mass production methods." Memorandum in Support of Proposed Decree, July 15, 1968, p. 28, n. 13.

*Case,* decided today, Congress in 1895 passed an Act specifically charging a competent government department to consider and mark such a line.[3] If the Court is willing to stay its hand and let this congressionally selected agency identify the inland water-outer sea line in future cases in accordance with this Act of Congress, we may hopefully look forward to having the courts relieved of this nonjudicial duty. I believe experience proves, however, that the effort of Congress to straighten out this muddle and give the submerged lands to the States is destined to a long, slow, almost endless delay, if the problem continues to be left to this Court.

The effect of the Court's holding today is that where the process of accretion is building up new land along the shores, the boundaries Texas may claim are not extended because, as we held last Term, they remain irrevocably fixed by the 1845 line, but as erosion gradually pushes back the present coastline at other points along the shore, the outer limit of the submerged lands owned by Texas is also pushed back toward shore. This argument of the United States, accepted today by the Court, truly deserves the ironic tribute by counsel for Texas in oral argument that it works for the United States precisely as the old game of "heads I win, tails you lose." Moreover, the Court admits that if the United States wins, the boundary between state and federal lands will be an ambulatory one, with oil leases by the State constantly subject to invalidation as erosion takes its toll on the land along the shore. The Court says that these inequitable results "derive from . . . the scheme Congress fashioned." *Ante,* at 6. I think those inequities rather result from the interpretation this Court has given the Act, chiefly by saying that Congress intended to give the

---

[3] 28 Stat. 672, 33 U. S. C. § 151. Congress first entrusted this duty to the Treasury Department, later to the Commerce Department, and later to the Commandant of the Coast Guard.

10

task of marking submerged land to judges rather than to surveyors, and by holding further that the task should be handled by reference to international treaties. The uncertainty and confusion created for those who accept oil leases from the State, and the unfairness of the one-sided rule under which only Texas can lose by future natural changes in the shoreline, can be eliminated by simply construing "coast line" in § 2 (b) of the Act to have the same natural meaning we attributed to that phrase only last Term, namely the historic coastline "as it existed" when Texas was admitted to the Union. And secondly, in future cases, all these problems and inequities could be simply avoided by choosing to follow the Coast Guard line, marked out as authorized by Act of Congress.

I dissent from the Court's acceptance of the proposed United States decree and would approve the decree of Texas.