**TEXACO, INC.**

v.

**Walter J. HICKEL, Secretary of the Interior, Appellant.**

**No. 23097.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1970.

Decided Aug. 19, 1970.

(Goodrich, J.) ; United States v. Beekman, 155 F.2d 580 (2d Cir. 1946) (Frank, J.).

Mr. George S. Swarth, Atty., Department of Justice, with whom Messrs. Edmund B. Clark, Attorney, Department of Justice, and Gerald D. Secundy, Attorney, Department of Justice, at the time the brief was filed, were on the brief, for appellant.

Mr. John J. Wilson, Washington, D. C., with whom Mr. William E. Rollow, Washington, D. C., was on the brief, for appellee.

Before LEVENTHAL, ROBINSON and MacKINNON,[*] Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment of the District Court granting Texaco's petition for a mandamus-type order to require the Secretary of the Interior to issue a permit to drill an offshore well, off the Louisiana coast. The basis of the action was that the proposed well site was within an area covered by a lease from the State of Louisiana, a lease that was maintained by a 1958 decision of the Secretary of the Interior pursuant to Section 6 of the Outer Continental Shelf Lands Act, 43 U.S.C. sec. 1335. Pursuant to a 1968 decision of the Department's Solicitor, the Secretary refused to issue the permit. The District Court's order vacated the 1968 decision of the Solicitor and directed the Secretary to issue a permit. For reasons set forth in this opinion we affirm the ruling vacating the 1968 decision of the Solicitor, but we remand in order to permit further consideration of the baseline issue within the Interior Department.

*Background*

On February 7, 1936, the State of Louisiana issued to Texaco's predecessors in interest State Mineral Lease No. 340 covering submerged land lying off the shore of Marsh Island and Vermilion Parish. The northern boundary of the leased land ran, with exceptions not here relevant, along the mean high water line. The southern boundary was established as:

Beginning at a point in the South shore line of Marsh Island * * *;

Thence South into the marginal or maritime belt of the Gulf of Mexico * * * to the extreme limit or boundary of the domain, territory and sovereignty of the State of Louisiana.

At the time the lease was executed, Louisiana claimed a seaward boundary three leagues from land.

In 1947 the Supreme Court decided United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, which held that the United States rather than the State of California owned the submerged land lying seaward of the ordinary low water mark. In 1950 the Court applied the same rule in the case of Louisiana. United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216. One effect of this 1950 decision was to deprive Texaco of the right to conduct offshore operations under its Louisiana lease of land "to the extreme limit" of Louisiana's sovereignty.

The coastal states, their lessees, and other interested parties objected strongly to these Tidelands decisions of the Supreme Court and sought relief in Congress. In 1953 Congress responded by enacting the Submerged Lands Act[1] and the Outer Continental Shelf Lands Act.[2] The Submerged Lands Act provided for the extension or confirmation of State boundaries out beyond the line of ordinary low water. All coastal states were given the right to claim a boundary three miles distant from the "coast line" as defined in the Act. States bordering on the Gulf of Mexico, which had traditionally claimed seaward boundaries in excess of three miles, were granted the opportunity to prove and claim such an historical boundary,—up to a limit of three marine leagues (approximately nine miles.)[3] The Outer Continental

---

[*] Circuit Judge MacKinnon did not participate in the disposition of this case.

1. 43 U.S.C. § 1301 *et seq.*

2. 43 U.S.C. § 1331 *et seq.*

3. Section 2(b), 43 U.S.C. § 1301(b), provides:

The term "boundaries" includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 4 but in no event shall the term "boundaries" or the term "lands beneath navigable waters" be interpreted as extending from the coast line more than three geo-

Shelf Lands Act asserted federal jurisdiction, including jurisdiction to grant mineral leases, over all submerged lands on the continental shelf seaward of the lands granted to the States by the Submerged Lands Act.

The 1953 legislation also concerned itself with the status of mineral leases which had been issued by the coastal states and which purported to grant an interest in the Submerged Land on the Outer Continental Shelf. Section 6(b) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1335(b) provides that any person holding such a lease "may continue to maintain such lease, and may conduct operations thereunder" provided that the lease meets the requirements specified in § 6(a). Section 6(a), 43 U.S.C. § 1335(a), states that § 6 is applicable to "any mineral lease covering submerged lands on the outer Continental Shelf issued by any State" if that lease meets a number of specified requirements, including the requirement that:

> (2) such lease was issued prior to December 21, 1948, and would have been on June 5, 1950, in force and effect in accordance with its terms and provisions and the law of the State issuing it had the State had the authority to issue such lease.

Section 6 contemplates that application shall be made to the Secretary of the Interior for a determination that a State lease meets the requirements of § 6(a) and that applicant is therefore entitled to continue to maintain the lease.

In 1953 Texaco filed an application with the Secretary pursuant to the Outer Continental Shelf Lands Act requesting authority to maintain its State Lease No. 340 as a federal lease. This application was rejected in the first instance by the Bureau of Land Management on the ground that the State Lease did not cover submerged land on the Outer Continental Shelf. Texaco appealed to the Solicitor of the Department of the Interior through whom the Secretary exercised his § 6 validation authority. Texaco contended that its State Lease covered land 27 miles out into the Gulf from the shore and offered in support of this claim a certificate issued by the Louisiana State Mineral Board, which, Texaco argued, should be conclusive on the issue of coverage.[4]

On February 12, 1958, the Solicitor ruled that Texaco was entitled to validation as to submerged land which Louisiana thought in good faith to be its property at the time it issued the lease and which it in good faith intended to convey to the leasee. Under this standard the Solicitor found that Lease No. 340 covered submerged land three leagues out into the Gulf of Mexico from the coast line.

graphical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico; Section 4, 43 U.S.C. § 1312, provides:

The seaward boundary of each original coastal State is hereby approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is hereby approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress.

4. Texaco's claim to a 27 mile boundary was based on Louisiana Act 55 of 1938 which purported to extend the boundary of Louisiana beyond the three-league line.

At the time of the 1958 validation proceeding before the Solicitor there was pending in the Supreme Court an original action brought by the State of Louisiana to establish an historical boundary of greater than three miles. In 1960 a decision was issued rejecting Louisiana's claim. United States v. States of Louisiana, Tex., 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025. Consequently Louisiana was entitled to claim only that seaward boundary granted to all coastal states by the Submerged Lands Act, namely three miles from the coast line as therein defined.

In 1965 the Supreme Court took up the question of the meaning of the words "coast line" for purposes of the Submerged Lands Act. In United States v. California, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296, the Court concluded that Congress intended to allow the courts broad latitude in formulating a coast line which would demarcate inland waters from the marginal sea. The Court went on to adopt the Convention on the Territorial Sea and the Contiguous Zone[5] as providing the definition of inland waters and thereby established the coast line for the purposes of the Submerged Lands Act to be the so-called "salient points" line.

Later in 1965 the Supreme Court issued a supplemental decree in the Louisiana boundary litigation awarding Louisiana submerged land within three miles of the salient points line. United States v. Louisiana, 382 U.S. 288, 86 S.Ct. 419, 15 L.Ed.2d 331. The concept of the salient points line will be considered further; it suffices here to say that this line is seaward of the shoreline.

On January 20, 1966, Texaco sought a permit to drill a well within three leagues of this salient points line but more than three leagues from any point on the shore.

Local officials of the Department of the Interior initially determined that Texaco's proposed well was beyond the seaward boundary of its lease. Texaco appealed this determination to the Secretary claiming that the 1958 decision of the Solicitor continuing Texaco's lease from the State of Louisiana determined that the seaward boundary of Texaco's lease was 9 miles from the coast line of Louisiana as defined in the Submerged Lands Act. On January 24, 1968, the Solicitor issued an opinion holding that the 1958 determination in fact established the seaward boundary of the continued lease to be a line 9 miles from the Chapman line, a line which, with respect to the lease here in issue, runs along the shoreline of Louisiana. The parties agree that the proposed well is more than 9 miles from this line.

On February 19, 1968, Texaco filed an action in the District Court to set aside the 1968 Solicitor opinion and to compel the issuance of a drilling permit. The District Court held that the opinion was without a reasonable basis, and ordered that a permit issue. The court noted that the continuation order which was the result of the 1958 validation proceedings defined the seaward boundary of the lease in terms of "coastline" and referred to the Submerged Lands Act for definition of this term. Turning to the Solicitor's opinion in 1958, the court found that the Solicitor intended to use the word "coastline" in conformity with the Submerged Lands Act and did not intend to fix in the validation proceeding the meaning of the Submerged Lands Act definition of "coastline." Therefore the court felt that the subsequent construction of the definition of "coast line" in the Submerged Lands Act which the Supreme Court announced in its 1965 decision, United States v. California, *supra,* should control.

■ Although we agree with the conclusion of the District Court that the action taken on January 24, 1968 in denying a drilling permit to Texaco was without a reasonable basis, we follow a different route to this conclusion. Inasmuch as the question of the appropriate baseline from which to measure the sea-

5. [1964] 2 U.S.T. 1607, T.L.A.S. No. 5639.

ward boundary of Texaco's lease was neither necessary to the decision to continue Texaco's lease nor actually litigated in the 1958 validation proceeding, it is our view that the Department was not legally justified in relying on the 1958 opinion and continuation order as establishing that baseline to be the Chapman line. By the same token, Texaco cannot rely on the 1958 opinion as conclusively establishing some other baseline. Accordingly we think that while Texaco is entitled to a judgment invalidating the 1968 Solicitor decision, the proper consequence of that judgment is a remand to the Department of the Interior for a de novo decision as to the appropriate base line.

*The Government's Contention that Despite the 1958 Decision Texaco Has No Right to Maintain its Lease on Submerged Land Located Seaward of the True State Boundary*

We first reject the Secretary's contention on appeal that Texaco's application for a drilling permit was properly denied because Texaco's 1936 lease gives it the right to drill only out to the "boundary" of Louisiana. The point is made that the 1950 and 1960 decisions of the Supreme Court establish that boundary at three miles from the coast line rather than an historical claim of three leagues. The Secretary argues that his predecessor lacked authority to determine that the State boundary described in the lease was a boundary of three leagues, and that the Government is not now bound by this error.

There is precedent allowing the Secretary of the Interior to "cancel a lease administratively for invalidity in its inception" in a case where a determination required by law had not been made, West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265 (1929), and in cases where the United States retains significant control over operations under the lease. Boesche v. Udall, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); McKay v. Wahlenmaier, 96 U.S.App.D.C. 313, 226 F.2d 35 (1955); see also Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920).

In the instant case, however, the Solicitor specifically determined that the standard for validation was not the true boundary of Louisiana as it would later be determined in the Supreme Court litigation pending at the time of the 1958 decision. The Solicitor was aware that a literal reading of the 1953 legislation might suggest the conclusion that a lease which in terms granted lands out to the State "boundary" could not grant an interest in lands on the Outer Continental Shelf for the reason that under the Act the State's boundary did not stretch beyond the beginning of the Outer Continental Shelf.

The Solicitor felt, however, that Congress did not intend that continuation of leases under § 6 should be delayed pending a determination by the Supreme Court as to the location of Louisiana's historic boundary. Moreover, he was of the view that it would defeat the purpose of § 6 to construe it to mean that a lease whose seaward boundary is described as being the seaward boundary of the State can not be said to cover land on the Outer Continental Shelf. He stated that:

> In enacting these provisions [for validation of offshore leases], Congress obviously intended that they should be administratively construed to authorize validation of leases in disputed areas of the Gulf of Mexico, and particularly in those areas which do not extend beyond 3 marine leagues into that Gulf.

> \* \*, \* \* \* \*

The Submerged Lands Act and the Outer Continental Shelf Lands Act must be read as a whole. The legislative history of both acts is replete with expressions that equity should be done to those who acted in good faith under State-issued leases, and section 6 was designed to accomplish that end. (S.Rept. 411, 83d Cong., 1st sess., p. 2; H.Rept. 1031, 83d Cong., 1st sess., p. 12.)

In his 1958 opinion the Solicitor also rejected the position of Texaco that the State Mineral Board Certificate was conclusive on the issue of coverage and that the Secretary's function in continuing the lease was merely ministerial. It was, in his view, clear from the language of § 6 that the Secretary is to make a determination as to whether the lease sought to be continued covers land on the Outer Continental Shelf and that in making this decision the Secretary is not bound by a certificate of the State Mineral Board. The Solicitor noted Texaco's contention that the issue of coverage would necessarily involve the Secretary in problems of State law, but did not regard this as a barrier, pointing out that State law also played a part in other matters under § 6(a) which were, as Texaco admitted, solely for the Secretary to determine.

In sum, the Solicitor's position was that in considering an application for the continuation of a lease purporting to cover submerged lands up to the seaward boundary of a coastal state effect should be given to the boundary specified by State law and contemplated by the parties to the lease provided that the State was able to make a good faith claim to such boundary. In considering what boundary Louisiana could in good faith claim, the Solicitor turned to the Submerged Lands Act for guidance. He was of the view that by authorizing the judicial determination of historical claims for boundaries to three leagues, Congress had intended that boundary claims within this limit were made in good faith. He stated:

> Reading the two acts of Congress in context, and as an earnest attempt on the part of Congress to effect an equitable and harmonious disposition of leasing problems arising from the Tidelands decisions of the Supreme Court by exercising its constitutional powers in such a way as to avoid injustice to States or persons acting pursuant to their permission (United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), it seems clear that the objectives can best be obtained by holding that any validation in this instance shall be strictly limited to those lands covered by leases lying beyond the 3-mile limit but extending in no instance beyond three marine leagues from the line of ordinary low water as stipulated by law.

\* \* \* \* \* \*

The Secretary's authority under specific provisions of statutory law to validate leases clearly comprehends leases for those areas between that 3-mile line and the 3-marine-league line drawn from the shoreline which were granted in good faith by the State of Louisiana under the assumption that the resources were its property. In that area it appears that the Texas Company is entitled to validation.

\* \* \* \* \* \*

The State appears clearly to have assumed a 3-league boundary historically and asserted such a claim in Louisiana v. Mississippi, 202 U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913 (1905). However erroneous this claim may have been, the claim seems to have been reasonable in light of the enabling act of 1811 (2 Stat. 641), the Act of Admission of 1812 (2 Stat. 701), and the first constitution of Louisiana (Louisiana Statutes Annotated—Constitutions, 1955, p. 511). While unwilling to confirm such claims in the Submerged Lands Act *ex proprio vigore,* the Congress certainly did not deny their reasonableness when it permitted their judicial determination under the language of section 2(b) of that act.

In our view the above constitutes a determination that the State of Louisiana could and did in good faith claim a three league boundary. The Solicitor further found that the boundary contemplated by the parties to the lease at the time it was issued in 1936 was a 3-league line. In reaching this conclusion he relied primarily on Act No. 55 of 1938 which while purporting to extend the boundary of Louisiana beyond the 3-league line, did recite that theretofore the boundary of Louisiana was "located

in the Gulf of Mexico three leagues distant from the shore." He also found that neither the 1938 Act nor the 1943 amendment to the lease served to enlarge the area covered by the lease. He said, "[T]he most that can be said for the 1943 agreement is that the [State Mineral] Board may have intended to interpret the original lease to include lands beyond the 3-league line on the condition that the 1938 claim would be judicially sustained. That contingency has never occurred."

These findings were and are legally adequate to support the 1958 decision to continue Texaco's lease as a Federal lease. The fact that the parties intended to define the boundary of Louisiana in terms of a three-league line and that Louisiana could in good faith claim such a boundary establishes that for the purpose of meeting the requirements of § 6(a) the lease covers land on the Outer Continental Shelf, and the lessee is entitled to continue to maintain it as a Federal lease. Moreover, we find the Solicitor's reading of the Act to be a reasonable one and we therefore see no basis for concluding that the Secretary lacked authority to interpret Lease No. 340 as one made in reference to a good faith boundary of three leagues and to continue it as so interpreted.

### Contention That The Baseline Was Determined By The 1958 Proceeding And Decision

Texaco and the Secretary both contend that the Department went further in 1958 than the determination that the parties to the lease sought to be continued intended in good faith to lease land out to the three-league line. They assert that the 1958 proceeding also established the baseline intended in good faith by the parties to the lease, though they disagree as to what baseline was fixed by the decision.

The Secretary says that the 1958 proceeding established that for the purpose of interpreting the State Lease the Louisiana boundary is to be determined from a baseline taken from the Chapman line, this being the Federal Government's most authoritative definition of the shoreline baseline. The Secretary does not, however, point to any language in the 1958 opinions which would suggest a finding either that the Chapman line is the shoreline which Louisiana claimed historically and in good faith or that it is the baseline which the parties intended at the time that the lease was issued in 1936.

The only mention of the Chapman line in the 1958 opinion is the statement that it is the most landward of the possible baselines. It may well be that the parties to the lease intended a baseline which happens to coincide with the Chapman line (which was defined in 1950), and there is indeed strong indication that Texaco assumed the baseline of its lease to be the shoreline. However, we can find no indication that the Department ever considered in 1958 whether the Chapman line did or did not reflect the baseline intended by Texaco and Louisiana in 1936. Nor can we see that the Department considered whether the Chapman line is the only baseline which Louisiana could use in good faith. There were no findings on these points in 1958, and the Secretary is not now entitled to treat these matters as settled by the 1958 proceedings. The 1958 decision was a significant contribution and clarification of the rights of the parties in its decision of the points that were at issue. It is not to be stretched beyond its fair intendment by projecting into it rulings or determinations on points that were not being presented for resolution.

For similar reasons we reject Texaco's claim that the 1958 proceedings established the baseline of the continued lease to be the coast line as defined in § 2(c) of the Submerged Lands Act. Obviously the parties did not in 1936 contract with reference to either the definition of coast line contained in the Submerged Lands Act of 1953 or to the judicial definition of that coast line in light of the Convention on the Territorial Sea and Contigu-

ous Zone, ratified by the United States in 1961 and not effective until 1964.

The fact that the concept of coast line set forth in § 2(c) of the 1953 act has been adopted by Congress as the appropriate baseline for purposes of the State's present legal three-*mile* boundary, does not mean that it is also the appropriate baseline for determining the area that could be taken as a lease made in good faith because of Louisiana's historical claim to a three-*league* boundary. Exactly the contrary is established by the decision of the Supreme Court in United States v. Louisiana, 389 U.S. 155, 88 S.Ct. 367, 19 L.Ed.2d 383 (1968). In that case the Court held that a state seeking to prove an historic claim within the three-league limit must rely on an *historic* baseline and is not entitled to the benefit of the baseline used by Congress in 1953 (later defined judicially by reference to the international conception later set forth in the Convention on the Territorial Sea and Contiguous Zone).[6]

In support of its contention Texaco places great emphasis on the summary of the Solicitor's decision contained in the continuation decision issued pursuant thereto. There it states that the Solicitor determined "that the State Lease included lands out to the three-league line from the coast line, as defined in Section 2(c) of the Submerged Lands Act. * * *"

We think that Texaco misconceives the intended meaning of this language. It does not say that the Solicitor determined that the parties made their lease agreement with reference to the baseline, claimed by Louisiana in good faith, which happens to coincide with the coast line defined in the Submerged Lands Act. It rather signifies that the Solicitor determined the lease to include lands on the Outer Continental Shelf to the extent its terms grant a lease on lands out to the three-league line from the coast line as defined in the act; in other words a determination fixing an outward limit on what Louisiana might seek to establish as an historical boundary claimed in good faith though erroneously. This reading is in conformity with the Outer Continental Shelf Act which provides that a continued lease shall be maintained in accordance with its terms as to area. Indeed the continuation decision specifically notes that the continued lease is a Federal lease to which the terms of the State Lease apply. This reading is also in conformity with our understanding of the Solicitor's decision. It appears rather clearly that the Solicitor's reference to the definition of coast line in the Submerged Lands Act was in the context of defining the area as to which a continuation application would be entertained, i. e. that area within which a good faith historical State boundary might lie. On the other hand, when the solicitor says Louisiana "appears clearly to have assumed a three-league boundary" and "never contemplated that the area covered by these instruments was less than three-leagues from the coastline" he must necessarily mean the "coast line" used by Louisiana in 1936 as the baseline for its three-league claim. There is no indication that

6. In this decision the Court distinguished between the standard grant of "three geographical miles distant from its coast line" and the historical grant of three leagues, applicable only to those states bordering the Gulf of Mexico, where "the term 'coast line' is omitted and in its place the word 'boundary' is used with the following express qualification: 'as it existed at the time such State became a member of the Union * * *.'" 389 U.S. at 160, 88 S.Ct. at 368.

Justice Stewart, concurring, noted, at 161–162, 88 S.Ct. at 371, that:

The critical term "boundaries" is given three alternative definitions in § 2 (b) of the Act:
1. "boundaries * * * as they existed at the time such State became a member of the Union," or
2. "boundaries * * * as heretofore approved by the Congress," or
3. "boundaries * * * as extended or confirmed pursuant to section 4," i. e., "three geographical miles distant from [the State's] coast line * * *."

the solicitor found it necessary or sought to determine what that baseline was.

Congress obviously did not intend that a continuation proceeding pursuant to § 6 of the Outer Continental Shelf Act must necessarily determine all questions concerning the extent of submerged land covered by a State lease sought to be validated. Indeed, the continuation decision before us explicitly recognizes that the acreage covered by Texaco's lease is dependent on boundary questions still to be resolved.

This conception, that tidelands litigation proceeds step by step, is exactly the approach followed by the Supreme Court. The historic ruling noted the impracticality of trying to resolve all coverage questions in a single litigation in view of the difficulty of the questions involved, including the "numerous difficulties in fixing the point where * * * inland waters end and the marginal sea begins * * *" United States v. California, 332 U.S. 19, 26, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1947). Congress intended to leave the Department of the Interior free to adopt a similar approach in the context of validation proceedings.

■■ Because an initial continuation proceeding is not meant to be a vehicle for the final resolution of all coverage questions, that proceeding has binding effect only with respect to those coverage questions which are in fact put in issue and determined. The preclusive effect of prior proceedings is to be determined with reference to the doctrines of collateral estoppel rather than by an attempt to use the doctrine of res judicata evolved by the courts for single, and definitive, resolution of private controversies. Texaco is mistaken in its premise that the 1958 proceeding necessarily fixed once and for all the precise coverage of its validated lease.

■■ Two features of the doctrines of collateral estoppel are applicable to the particular problem before us. The first is the rule that there can be no estoppel as to issues which were not in fact litigated;[7] the second is the rule that in appropriate circumstances judicial decisions subsequent to the prior litigation may constitute such changed circumstances as to prevent an estoppel.[8]

Whatever may be the difficulties in applying these rules in borderline situations or in the context of administrative procedure, there can be no doubt that they preclude a holding in the instant appeal that the Solicitor's 1958 opinion conclusively settled the baseline issue. The baseline issue was not litigated in 1958, and indeed was not even raised.

■ We are in effect being asked to read a subsequent court decision back into the 1958 administrative determination despite the absence of any clear indication that to do so will effectuate whatever may have been intended by the 1958 decision. The effect of the course that we are asked to adopt would be to make a later and reasonably unforeseeable judicial development dispositive as to the outcome of a prior proceeding. The sound course for considering the impact of the subsequent court decision on the prior administrative determination is to provide for further administrative consideration in light of that change at least where, as here, the court can not say that only one result would have been reasonable and in accordance with Congressional purpose. Indeed the need for a fresh look is underscored in the case before us, for while United States v. California, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965) appears to favor Texaco's position, United States v. Louisiana, 389 U.S. 155, 88 S.Ct. 367, 19 L.Ed.2d 383 (1968) raises substantial doubt as to the precise impact of the *California* decision on this particular baseline problem.

---

7. Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 671, 64 S.Ct. 268, 88 L.Ed. 376 (1944).

8. *See* Comm'r. of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) ; Restatement, Judgment § 70 (1942) ; 1B Moore's Federal Practice ¶ 0.448.

**646**

*Conclusion*

 It is a sound and important policy in the administration of justice that what has already been done and determined not be redone and redetermined unnecessarily. This policy requires that courts not be niggardly in giving full effect to prior determinations of fact and right. But the effort to find answers in a decision that has been made requires an analysis of the intention of the decision. We think the 1958 decision too uncertain, and the impact of later case law developments both too far reaching and too ambiguous, to warrant the conclusion that the Solicitor's decision wrought a final and definitive resolution on a point which was not put before him.

The judgment of the District Court is affirmed insofar as it vacates the 1968 decision of the Solicitor. That judgment is reversed insofar as it directs the Secretary to issue a drilling permit. The cause is remanded to the District Court with instructions to enter a judgment declaring that plaintiff is entitled to a de novo decision by the Secretary as to the appropriate baseline for its lease, made with reference to the good faith understanding of the parties when the lease was issued in 1936.

So ordered.