GRABER, Circuit Judge:
The government of Guam brought this action against the United States, alleging that it is entitled to own or control about 24,000 acres of land pursuant to the Organic Act of Guam, the Territorial Submerged Lands Act, and the doctrine, of aboriginal title. The district court disagreed and granted summary judgment to the United States. We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The facts are not in dispute. In 1898, Spain ceded Guam, including 41,859 acres *632 of Spanish-owned property (crown land), to the United States. In that same year, the President of the United States placed Guam under the control of the Department of the Navy. Guam remained under the Navy’s control until 1941, when Japan captured the island during World War II.
After the United States recaptured Guam in 1944, it increased its military presence on the island. That increased presence required more land, which the United States continued to acquire until 1950.
In 1950, Congress passed the Organic Act of Guam, which established a civil government in Guam. Pursuant to that Act, the United States gave to the newly created government 1,250 acres of land that the naval government of Guam had used in the administration of civil affairs. However, the United States retained more than 42,000 acres of land that it had been using for other purposes.
Between 1950 and 1991, the United States condemned new land in Guam at least once (186.87 acres in 1962) and occasionally transferred unneeded land to the government of Guam (879 acres in the early 1980s and 3,200 acres in 1994). In 1992, the Navy declared to be “excess” (a) 371 acres of land at Ritidian Point and (b) 15,571 acres of submerged land adjacent to the property. The Navy transferred the 371 acres of dry land to the United States Fish and Wildlife Service for use as part of a wildlife refuge and transferred the 15,-571 acres of submerged land to the General Services Administration for later redistribution.
In April 1995, the Department of Defense published the “Guam Land Use Plan 1994.” That plan identified another 8,200 acres of land in Guam that the United States military did not need.
On September 22, 1995, the government of Guam brought this action against the United States to acquire title to or control over (1) the 371 acres of land at Ritidian Point, (2) the 15,571 acres of submerged lands adjacent to Ritidian Point, and (3) the 8,081 acres of other land in Guam that is no longer needed for military purposes.[1] Guam argued that it was entitled to that land pursuant to the Organic Act of Guam, the Territorial Submerged Lands Act, and the doctrine of aboriginal title.
Thereafter, the parties filed cross-motions for summary judgment. The district court granted the United States’ motion. Guam moved for reconsideration, which the district court denied. This timely appeal ensued.
STANDARD OF REVIEW
We review de novo the district court’s grant of summary judgment to determine “whether the district court correctly applied the law and if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact.” Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998).
ORGANIC ACT OF GUAM
A. Statutory Framework
On August 1, 1950, Congress passed the Organic Act of Guam (Organic Act). See Organic Act of Guam, Pub.L. No. 630, 64 Stat. 384 (1950) (codified at 48 U.S.C. § 1421 et seq.).[2] The Act establishes and defines the power of a civil government in Guam. See § 3 (codified at 48 U.S.C. § 1421a); see also § 5 (codified at 48 U.S.C. § 1421b) (establishing the *633 Guam Bill of Rights); Kenda K. Tomes, State Taxation of Puerto Rican Obligations: An Interesting) Question, 66 Chi.-Kent L.Rev. 903, 930 (1992) (“Congress enacted the ‘Organic Act of Guam’ to provide a civil government for Guam.”).
To help the newly established government, Congress transferred to it some of the property that the United States owned in Guam. First, Congress unconditionally transferred title to all property owned by the United States that the naval government of Guam had used “in the administration of the civil affairs of the inhabitants”:
The title to all property, real and personal, owned by the United States and employed by the naval government of Guam in the administration of the civil affairs of the inhabitants of Guam, including automotive and other equipment, tools and machinery, water and sewerage facilities, bus lines and other utilities, hospitals, schools, and other buildings, shall be transferred to the government of Guam within ninety days after the date of enactment of this Act.
§ 28(a) (codified at 48 U.S.C. § 1421f(a)). The land at issue here was not “employed by the naval government of Guam in the administration of the civil affairs” and, thus, Guam did not receive an unconditional grant of that land.
Subsection (b) transferred control over the remainder of the property that the United States owned in Guam, subject to one limitation:
All other property, real and personal, owned by the United States in Guam, not reserved by the President of the United States within ninety days after the date of enactment of this Act, is hereby placed under the control of the government of Guam, to be administered for the benefit of the people of Guam, and the legislature shall have authority, subject to such limitations as may be imposed upon its acts by this Act or subsequent Act of the Congress, to legislate with respect to such property, real and personal, in such manner as it may deem desirable.
§ 28(b) (codified at 48 U.S.C. § 1421f(b)) (emphasis added). The land at issue here was “other property ... owned by the United States.”[3] However, the President reserved that land for the United States on October 30, 1950, which was a date “within ninety days after the date of enactment of this Act.” See Executive Order No. 10178, 15 Fed.Reg. 7313 (1950), reprinted at 48 U.S.C. § 1421f. Thus, the land did not pass to Guam in 1950.
Guam argues, however, that § 28(b) has continuing force and requires the United States to transfer all property that it owns in Guam that is no longer used for a military purpose. Because the land at issue here is no longer needed for a military purpose, Guam argues that § 28(b) entitles it to control that land.
B. Statutory Text and Context
“When interpreting a statute, this court looks first to the words that Congress used.” Sanchez v. Pacific Powder Co., 147 F.3d 1097, 1099 (9th Cir.1998). “Rather than focusing just on the word or phrase at issue, this court looks to the entire statute to determine Congressional intent.” Id. If the wording of the statute unambiguously demonstrates Congressional intent, we need look no further. See Sloan v. West, 140 F.3d 1255, 1261 (9th Cir.1998) (“If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent.”).
The plain wording of § 28(b) establishes that Congress intended a one-time grant of property. Section 28(b) contains two interrelated clauses. The first clause gives the Guamanian government control over *634 all property not already transferred to it under § 28(a). The second clause, however, conditions that grant on the President’s not reserving the property within 90 days: “All other property ... owned by the United States in Guam, not resewed by the President of the United States within ninety days after the date of enactment of this Act, is hereby placed under the control of the government of Guam .... ” § 28(b) (emphasis added).
After 90 days, the condition was satisfied and the grant of property was complete: Guam owned or controlled all the property previously owned by the United States, except for the property that the President had reserved. Nothing in the wording of the statute suggests that § 28(b) has continuing force or that § 28(b) requires the United States to transfer all property that it owns in Guam that is no longer used for a military purpose.
Context supports the plain meaning of subsection (b). First, Congress included a similar 90-day provision in subsection (a): “The title to all property ... shall be transferred to the government of Guam within ninety days after the date of enactment of this Act.” Congress’ choice to fix Guam’s right to property under subsection (a) after 90 days suggests that Congress intended similarly to fix Guam’s right to property under subsection (b) after 90 days.
Second, subsection (c) provides:
All property owned by the United States in Guam, the title to which is not transferred to the government of Guam by subsection (a) hereof, or which is not placed under the control of the government of Guam by subsection (b) hereof, is transferred to the administrative supervision of the head of the department or agency designated by the President under section 3 of this Act, except as the President may from time to time otherwise prescribe: Provided, That the head of such department or agency shall be authorized to lease or to sell, on such terms as he may deem in the public interest, any property, real and personal, of the United States under his administrative supervision in Guam not needed for public purposes.
§ 28(c) (codified at 48 U.S.C. 1421f(c)) (emphasis added, except emphasis on “Provided”).[4] The final clause of subsection (c) allows the United States to sell property that the President reserved under subsection (b). That provision can have meaning only if Congress intended for subsection (b) to constitute a one-time grant of property. Under Guam’s reading of the statute, Congress’ inclusion of the last clause is superfluous — the United States never could sell any property, because the property would revert to Guam automatically as soon as it was “not needed for public purposes.” This court generally refuses to interpret a statute in a way that renders a provision superfluous. See Burrey v. Pacific Gas & Elec. Co., 159 F.3d 388, 394 (9th Cir.1998) (“In interpreting a statutory provision, we must avoid any construction that renders some of its language superfluous.”).
Moreover, Guam’s argument — that § 28(b) requires the United States to transfer control to Guam over all property not used for a military purpose — would eviscerate another of subsection (c)’s provisions. Subsection (c) gives the President the authority to choose the department that will control the property reserved under subsection (b). Under Guam’s interpretation of the Act, the President could give control over the property to a nonmilitary agency such as the Department of Education, but if that agency used the property for a non-military purpose, then the property would revert to Guam. *635 Guam’s interpretation thereby robs subsection (c) of its practical meaning.
A contextual reading of the Organic Act thus supports the plain meaning of subsection (b): Congress intended to provide Guam with a one-time grant of property, a grant that became fixed 90 days after enactment of the Organic Act. Therefore, we hold that the wording of the Organic Act unambiguously demonstrates Congressional intent.
C. Guam’s Arguments
Guam nevertheless presents six reasons why Congress intended for § 28(b) to have continuing force. We consider each in turn.
1. Guam’s Reading of § 28(b)
Guam argues that, when Congress drafted § 28(b), it intended for the phrase “is hereby placed” to mean “is hereby ordained to be placed when the appropriate circumstances arise.” Similarly, Guam asserts, Congress intended for the phrase “not reserved” to mean “while reserved.” Guam thus concludes that Congress intended for § 28 to read:
All other property, real and personal, owned by the United States in Guam, [while reserved] by the President of the United States within ninety days after the date of enactment of this Act, [is hereby ordained to be placed when the appropriate circumstances arise] under the control of the government of Guam, to be administered for the benefit of the people of Guam, and the legislature shall have authority, subject to such limitations as may be imposed upon its acts by this Act or subsequent Act of the Congress, to legislate with respect to such property, real and personal, in such manner as it may deem desirable.
Were we to accept Guam’s significant redrafting of the statute, then Guam might be entitled to the land at issue. However, we are bound by the words that Congress actually used. See United States v. Great Northern Ry. Co., 343 U.S. 562, 575, 72 S.Ct. 985, 96 L.Ed. 1142 (1952) (“It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written.”); Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co., 981 F.2d 429, 437 (9th Cir.1992) (“Separation of powers principles and the value of democratic rule prohibit us from ‘interpreting’ [a] statute such that we are, in fact, amending [it].”).
2. Section 38
Guam next argues that § 33 of the Organic Act authorizes the President to reserve land for military purposes. According to Guam, if we interpret § 28(b) as a one-time grant, then § 33 is superfluous.
Section 33 states:
Nothing contained herein shall be construed as limiting the authority of the President to designate parts of Guam as naval or military reservations, nor to restrict his authority to treat Guam as a closed port with respect to the vessels and aircraft of foreign nations.
(Codified at 48 U.S.C. § 1421k.) As is apparent, § 33 is not an operative provision but, instead, is a provision designed to protect against reading implications into the Organic Act. See Garnett v. Renton Sch. Dist. No. 403, 987 F.2d 641, 645 (9th Cir.1993) (so interpreting a similar provision in the Equal Access Act).
Our interpretation of § 28(b) does not render § 33 superfluous. In § 28(b), Congress authorized Guam to control, but not to own, federal public land — land that the President did not reserve within 90 days of enactment. Section 33 simply ensured that, to the extent that Guam received control of such land, nothing in the Act prevented the President from taking back control of the land if needed later for a military purpose. Whether § 28(b) provides a one-time or a continuing grant of property, § 33 still serves this intended purpose.
*636 3. Interpretation of Similar Statutes Third, Guam argues that its reading of
the Organic Act is mandated by the Supreme Court’s interpretation of similar statutes. We disagree.
Guam relies first on the Supreme Court’s interpretation of the Utah Enabling Act, which states in part:
That upon the admission of said State into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed State, and where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any Act of Congress other lands equivalent thereto, in legal subdivisions of not less than one quarter section and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said State for the support of common schools, such indemnity lands to be selected within said State in such manner as the legislature may provide, with the approval of the Secretary of the Interi- or....
Utah Enabling Act, Pub.L. No. 138, 28 Stat. 109 (1894) (emphasis added). In Andrus v. Utah, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980), the Supreme Court held that Utah’s right to indemnity or “in lieu” land (lands to replace land sold by the United States) did not become “vested” when Utah became a state. Guam suggests that the Court reached that decision by holding that the phrase “hereby granted” constituted a continuing grant of land. Guam reasons that we must give the term “hereby” a similar meaning in the Organic Act.
Contrary to Guam’s argument, the Court did not rely on the phrase “hereby granted.” Instead, the Court held that it was unnecessary to decide whether the Act constituted a present or future grant of land, because the Act granted specific, numbered parcels of land. See id. at 506-07, 100 S.Ct. 1803. Accordingly, title to the land did not vest until Utah actually surveyed the land: “Whether the Enabling Act contained words of present or future grant, title to the numbered sections did not vest in the State until completion of an official survey.” Id. Until Utah satisfied that condition, the United States “remained free to dispose of the designated lands.” Id. at 507, 100 S.Ct. 1808; see id. at 508 n. 10, 100 S.Ct. 1803 (“Until the status of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them.”) (citation and internal quotation marks omitted) (emphasis in original). Thus, the right to indemnity or “in lieu” lands did not become fixed until Utah had satisfied the condition of the Act. See id. at 507, 100 S.Ct. 1803. “Because much of the State was not surveyed until long after its admission to the Union, its indemnity or ‘in lieu’ selections were not made promptly.” Id. at 502, 100 S.Ct. 1803.
Indeed, rather than supporting Guam’s argument, Andrus supports our interpretation of the Organic Act. As in Andrus, the Organic Act provided a grant of land subject to a condition: that the President not reserve the land within 90 days. That condition was satisfied 90 days after the effective date of the Organic Act. At that time, the rights of all parties became fixed: Guam received all land that the President had not reserved.
Guam also relies on the Supreme Court’s interpretation of the Submerged Lands Act of 1953, which states in part:
It is hereby determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the .boundaries of the respective States, and the natural resources within such lands and waters ... are hereby, subject to the provisions-hereof, recognized, confirmed, established, and vested in and assigned to the respective States....
43 U.S.C. § 1311(a) (emphasis added). Guam argues that the Supreme Court interpreted the phrase “are hereby ... vest *637 ed in” as a continuing grant of land. Once again, we are not persuaded.
The Submerged Lands Act does “hereby” grant the states certain rights. However, the Act defines the boundaries of the land grant using ambiguous terms. For example, Congress did not define the term “inland waters,” even though the location of such waters necessarily changes over time due to erosion, accretion, and reliction. See United States v. Louisiana, 394 U.S. 11, 33, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969) (The Louisiana Boundary Case) (“[T]he shoreline is constantly shifting as the Mississippi River and violent Gulf storms remold the soft, silt-like delta soil.”). Thus, the question before the Court was whether to fix the boundary at a specific date or leave it ambulatory, changing as the coastline changes:
[T]he 1845 coastline has been substantially modified by extensive erosion and some accretion in the intervening period of more than a century. This modification has occasioned a dispute between the United States and Texas as to whether the [Act] ... is to be read as measuring from the 1845 coastline, as Texas contends, or from the coastline as it exists currently or at any time in the future, as the United States contends.
United States v. Louisiana, 394 U.S. 1, 2-3, 89 S.Ct. 768, 22 L.Ed.2d 36 (1969) (The Texas Boundary Case).
In three cases, the Supreme Court adopted the ambulatory definitions from the Convention on the Territorial Sea and the Contiguous Zone, an international treaty. See United States v. California, 381 U.S. 139, 165, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965) (“The Convention on the Territorial Sea and the Contiguous Zone, approved by the Senate and ratified by the President, provides such definitions. We adopt them for purposes of the Submerged Lands Act.”) (footnote omitted); see also The Texas Boundary Case, 394 U.S. at 4-6, 89 S.Ct. 768 (stating the same rule); The Louisiana Boundary Case, 394 U.S. at 35, 89 S.Ct. 773 (stating the same rule) (citation omitted). Pursuant to those decisions, the boundaries of the land (i.e., the location of the land) granted to the states necessarily would change over time. But, that change occurs not because Congress provided a continuing grant of land. Instead, it occurs because Congress defined the boundaries of the granted land using ambulatory terms.
Congress faced no such problem under the Organic Act. The boundary dispute cases thus shed no light on whether Congress intended the Organic Act to constitute a one-time or a continuing grant of land.
Guam also argues that courts have interpreted Section 5(a) of the Submerged Lands Act to provide a continuing grant of land: “Section 5(a) of the Submerged Lands Act, 43 U.S.C. 1313(a), ... omits from the grant ‘land expressly retained by ... the United States when the State entered the Union.’ Notwithstanding the literal tie to a specific date, this provision has been construed to exempt from transfer land that emerged after statehood and after passage of the Submerged Lands Act.”
Guam misconstrues precedent. Courts have held that the United States owns newly emerged land because the Act, 43 U.S.C. § 1313(a), expressly retains for the United States “accretions” to its land. See California ex rel. State Lands Comm’n v. United States, 457 U.S. 273, 283, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982) (“Section 5(a) of the Act [43 U.S.C. § 1313(a)], however, withheld from the grant to the States all ‘accretions’ to coastal lands acquired or reserved by the United States.”); California ex rel. State Lands Comm’n v. United States, 805 F.2d 857, 861 & n. 2 (9th Cir.1986) (stating a similar proposition). Because Congress expressly reserved future land in the Submerged Lands Act but not in the Organic Act, the former provides no support for Guam’s argument that we should imply such a future grant in the latter.
*638 4. Interpretation of a Statute in Favor of Aboriginal Inhabitants
Ordinarily, courts interpret a federal land grant in favor of the United States. See United States v. Union Pac. R.R. Co., 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957). That rule does not apply, however, when the United States grants land to Native Americans. In those circumstances, “[sjtatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.” County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (citation and internal quotation marks omitted).
Guam argues that this principle applies equally to the native inhabitants of Guam and, thus, requires us to interpret the statute in its favor. Assuming, without deciding, that the rule applies here, it does not assist Guam. “The canon of construction regarding the resolution of ambiguities in favor of Indians ... does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.” South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). The Organic Act unambiguously demonstrates Congress’ intent to provide a one-time grant of property. This interpretative aid cannot defeat that unambiguously expressed intent.
5. Guam Land Transfer Act and Guam Land Acquisition Act
Guam next argues that we must read the Organic Act in the light of the Guam Land Transfer Act of 1945, which allows for the sale of land that is no longer required for a military purpose:
That for the purpose of effecting the rehabilitation and resettlement of the residents of Guam, the Secretary of the Navy, or such officer as he may designate for such purpose and under such regulations as he may prescribe, is hereby authorized to transfer to the naval government of Guam, for transfer or sale by the naval government of Guam at its discretion, to such persons and upon such terms and conditions and at such times as it may determine to be suitable, in replacement of lands acquired for military or naval purposes in Guam, such lands owned by the United States in Guam as may be determined by the Secretary of the Navy, after consultation with the Secretary of War, not to be required for military or naval purposes.
Guam Land Transfer Act, Pub.L. No. 225, 59 Stat. 584 (1945). That Act expressly authorized the transfer of land “not ... required for military or naval purposes.” Congress chose not to include similar wording in the Organic Act. In the circumstances, we must give effect to the different wording. See Zimmerman v. Oregon Dep’t of Justice, 170 F.3d 1169, 1177 (9th Cir.1999) (“[W]e must give effect to the different wording and different focus of the two provisions.”).
Guam also attempts to rely on the Guam Land Acquisition Act of 1946, Pub.L. No. 594, 60 Stat. 803 (1946). However, that Act pertains to acquisition, not transfer, of land. That being so, the Act sheds no light on the meaning of the land-transfer provisions in the Organic Act.
6. Defeat of the Obvious Intent of Congress
Finally, Guam argues that interpreting the statute as a one-time grant would defeat the obvious intent of Congress. “In all cases of statutory construction, the plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.” California Central Trust Bankcorp v. Been (In re Been), 153 F.3d 1034, 1036 (9th Cir.1998) (citation and internal quotation marks omitted). See also Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, *639 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (“[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.”). This is not one of those “rare” cases.
After the United States recaptured Guam from Japan, the United States acquired many acres of land for use by the military. However, by the late 1940s, the military was no longer using much of that land; by 1950, more than 50 percent of the actual acreage in Guam was occupied by inactive military installations. See Civil Gov’t of Guam: Hearing on S. 185, S. 1892 & H.R. 7273 Before a Senate Subcomm. of the Comm. on Interior and Insular Affairs, 81st Cong. 62, 2d Sess. (Apr. 19, 1950). As noted above, Congress previously had enacted the Guam Land Transfer Act to allow for the release of some of this land. Congress expressed a similar purpose when drafting the Organic Act:
The committee recommends that the need of the military for the land now held by it should be carefully reexamined, with the object of releasing at the first possible moment all lands not actually required for military purposes.
H.R.Rep. No. 81-1677, at 11 (1950).
That the armed forces immediately resurvey their military needs for lands throughout the Trust Territory, and in Guam and American Samoa, so that all land not absolutely required for military purposes may be returned to private ownership and use.
Hearing on H.R. 4499 Before the Senate Comm, on Interior and Insular Affairs, 81st Cong. 20, Exec. Sess. (Jan. 30, 1950).[5] Guam argues that interpreting the Organic Act as a one-time grant would defeat that obvious purpose, because the President reserved all or almost all the property subject to § 28(b). Thus, Guam reasons, unless § 28(b) imposes a continuing grant of property, it was an “empty promise to the Guamanian people.”
Guam’s argument is premised on its belief that the sole purpose of § 28(b) was to transfer control of property to the Guamanian government. However, Congress knew how to create such a transfer provision if it had that intent: Subsection (a) unconditionally transferred all property owned by the United States that the naval government of Guam had used “in the administration of the civil affairs of the inhabitants.” See also Guam Land Transfer Act, 59 Stat. 584 (authorizing Congress to transfer land when no longer required for military purposes). Congress used different wording in subsection (b).
The wording of subsection (b) instead suggests that Congress’ purpose was to force the President to decide promptly and affirmatively whether to retain property. That interpretation is equally supported by the legislative history, which demonstrates Congress’ frustration that the military had not yet released land that even it believed was unnecessary. See, e.g., Civil Gov’t of Guam, at 37 (“I am going to ask the Governor now, have they returned that 26,000 acres that the military agrees it does not need and which we in Public Lands were told 2 years ago thát the military did not need ... ?”). If Congress’ purpose was to require the President affirmatively and promptly to reserve land that he believed that the federal government still needed, then that purpose was accomplished, even though the President decided to reserve all or almost all the land subject to § 28(b). Guam has not established an “obvious” purpose that the plain wording of the statute will defeat.
D. Conclusion
We hold that Congress unambiguously intended for § 28(b) to provide Guam with a one-time grant of property. The district *640 court did not err by granting summary judgment to the United States on Guam’s first claim.
TERRITORIAL SUBMERGED LANDS ACT
Guam also claims that it is entitled to submerged land adjacent to the land discussed above. However, Guam acknowlr edges that it cannot prevail on its claim for submerged land unless it prevails on its claim under the Organic Act. Because we hold that Guam is not entitled to any land under the Organic Act, we also hold that it is not entitled to any submerged land adjacent to that property.
ABORIGINAL TITLE
Finally, Guam claims that it is entitled to control some of the land at issue under the doctrine of “aboriginal title.” The district court refused to decide whether that doctrine applies to the native inhabitants of Guam, holding instead that the doctrine would not entitle Guam to the relief that it seeks. Because we agree with the district court, we also assume, without deciding, that the doctrine of aboriginal title applies to the native inhabitants of Guam.
“Aboriginal title refers to the right of original inhabitants of the United States to use and occupy their aboriginal territory.” Confederated Tribes of Chehalis Indian Reservation v. Washington, 96 F.3d 334, 341 (9th Cir.1996). Accordingly, the right to aboriginal title belongs only to tribes and, in some circumstances, to individual members of tribes. See United States v. Dann, 873 F.2d 1189, 1195-96 (9th Cir.1989) (“The common view of aboriginal title is that it is held by tribes.... Nevertheless, the Supreme Court has ... recognized that individual aboriginal rights may exist in certain contexts.”) (citation and internal quotation marks omitted); see also William C. Canby, Jr., American Indian Law, pp. 347-48 (3d ed.1998) (stating a similar proposition).
The government of Guam is neither a tribe nor a tribal member. Therefore, the government of Guam qua government cannot claim any aboriginal right to use or occupy tribal land.
Guam argues in response that it has a right to control the land as a trustee for the aboriginal inhabitants of Guam. The Constitution, however, gives Congress that power:
It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized.... Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law.
Oneida Indian Nation of N.Y. State v. County of Oneida, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). See also Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 276, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (“The Constitution grants Congress ... the power to set national policy respecting Indian lands.... ”).
Congress can delegate its authority over aboriginal land rights. See Turtle Mountain Band of Chippewa Indians v. United States, 203 Ct.Cl. 426, 490 F.2d 935, 945 (Ct.Cl.1975). Guam argues that the Organic Act constitutes such a delegation. As noted above, however, the Organic Act delegates authority over the property at issue to the executive branch of the federal government, not to the territorial government of Guam. To the extent that Congress intended to delegate its trust authority over aboriginal rights to that land, Congress did not delegate its authority to the territorial government of Guam.
In this connection, Guam also relies on the Land Transfer Act of 1945. That Act allowed the United States naval government, not the territorial government, to transfer or sell property for the “resettle *641 ment of the residents of Guam.” See Pub.L. No. 225, 59 Stat. 584 (1945). Nothing in that Act suggests an intention to delegate trust responsibility to the territorial government of Guam.
In summary, Guam has not demonstrated that Congress delegated its authority over aboriginal land rights to the territorial government. Guam has cited no precedent allowing a governmental body to compel Congress to make such a delegation. In the circumstances, the district court did not err by holding that Guam’s claim to aboriginal title would not entitle it to any relief.
AFFIRMED.

. Guam's original complaint sought 22,477 acres of "other” land. Guam filed an amended complaint on November 9, 1995, reducing its request to 8,081 acres.

. The enacted wording and the codified wording of the Act differ slightly. We rely on the enacted version. See Trailer Train Co. v. Leuenberger, 885 F.2d 415, 416 n. 2 (8th Cir.1988) ("The language of 49 U.S.C. § 11503 codifying Section 306 differs from the language of Section 306 as enacted. The court relies on the language used in Section 306.”).

. When Congress passed the Organic Act, the United States had not yet acquired 183.7 acres of the land at issue here.

. Congress amended subsection (c) in 1968 to give control over the property to the Secretary of the Interior, unless the President provides otherwise. See Pub.L. No. 90-497, 82 Slat. 848 (1968).

. Both passages from the legislative history, as well as the Land Transfer Act, refer to Congress' desire to return unneeded land to private use in Guam. They do not necessarily suggest that Congress intended to give such property to the territorial government of Guam.